786 N.E.2d 212 (2003)
271 Ill.Dec. 954
In re R.K. (The People of the State of Illinois, Petitioner-Appellee,
v.
R.K., Respondent-Appellant).
No. 1-01-1641.
Appellate Court of Illinois, First District, Sixth Division.
February 21, 2003.
*213 Public Defender of Cook County, Chicago (Emily Eisner, of counsel), for Appellant.
State's Attorney of Cook County, Chicago (Janet Powers Doyle, Esther Hong, of counsel), for Appellee.
Presiding Justice SHEILA M. O'BRIEN delivered the opinion of the court:
Following a bench trial pursuant to a petition seeking involuntary medication of respondent R.K., an involuntary patient at Tinley Park Mental Health Center, the trial court found respondent subject to involuntary medication with psychotropic drugs for a period not to exceed 90 days. Respondent contends that the trial court erred in granting the petition where she was neither suffering nor experiencing deterioration in her ability to function, where she was capable of making a reasoned decision concerning her own treatment and where less restrictive treatment was available.
On February 14, 2001, Dr. Sunil Ballal, a psychiatrist employed at Tinley Park Mental Health Center, filed a petition in the circuit court of Cook County asserting that respondent required psychotropic medication but refused to take the medication when offered by the hospital staff. Dr. Ballal stated that respondent suffered from paranoia and hallucinations, she was loud and threatening toward her mother and hospital staff, and her ability to function was deteriorating. The doctor noted that respondent's mother would not allow her to return home unless respondent took her prescribed medication. Respondent refused to discuss her illness with the doctor because she did not believe that she was ill, but believed that the intention of hospital staff was to imprison her.
During the trial on April 17, 2001, Steve Buhle, a mental health technician employed at the Tinley Park Mental Health Center, testified that on April 3, 2001, he escorted respondent to court. When the proceedings concluded, respondent attempted to leave the courthouse. Although she stopped in the parking lot and returned toward the courthouse when Buhle told her to do so, she became agitated when he took her by the elbow to lead her back inside. She asked him to take his hands off of her and when he responded that he could not do that, she wrenched her arm away and punched him in the stomach. When they later arrived back at the hospital, a paper bag containing her belongings tore. Respondent then threw the bag to the floor and began kicking its contents across the floor.
Dr. Ballal testified that pursuant to court order, respondent was hospitalized involuntarily on December 16, 2000, and that the commitment order expired at the end of April. Essentially, the doctor testified that respondent did not acknowledge that she was mentally ill, she rejected any type of evaluation of her condition, she refused all medication and she experienced *214 bouts of hostile, agitated and aggressive behavior. He had observed her five days a week since her admission, but each time that he asked her to come to his office for an evaluation, she replied, "No, thank you." He found that she was clearly suffering from psychosis but because he could not perform any psychological testing, he was unable to fully evaluate her condition. He diagnosed her as having psychosis NOS (not otherwise specified). He based his diagnosis on his own observations, information contained in respondent's hospital chart and the courtroom testimony of respondent's family during her commitment hearing. He stated that the extent of her psychosis prevented her from participating in less restrictive, alternative treatments such as individual or group therapy. He believed that without medication respondent's prognosis was guarded and poor, and it was unlikely that her symptoms would subside "on their own." He believed that with medication her prognosis was very good because she was "high functioning," "alert" and "spontaneous." He predicted that with the medications respondent would be less paranoid under stress, she would not manifest some of the psychotic symptoms that she had manifested in the community and she would be able to continue her family life in a peaceable manner and continue her professional pursuits as a social worker. He stated that respondent last demonstrated "episodic agitation" two weeks before the trial when she learned that she was not going to be discharged. She then became physically aggressive and struck a staff member.
When asked about the side effects of the medications that he was recommending, the doctor responded that the most common were dryness of the mouth, blurring of vision, constipation, tremors of the hands and stiffness in the muscles. If the medications are administered for a prolonged period of time, patients can experience tardive diskinesia, an untreatable movement disorder manifested by tremors in the lips, tongue and muscles around the mouth. Some patients suffer from tardive diskinesia during the initial phase of treatment. A patient was much less at risk of suffering tardive diskinesia from Olanzapine (also known as Zyprexa). He stated that for all of the side effects except tardive diskinesia, Cogentin was helpful for providing symptomatic relief. He noted that when he administered Haldol to respondent on an emergency basis, she "doubled-up" in an acute reaction of muscle stiffness, but an immediate injection of Cogentin completely relieved her symptoms. He opined that if he were able to stabilize respondent with Haldol, he would then change her medication to Zyprexa (Olanzapine) and that with the two medications, she would "do fine without long term tardive diskinesia or [would experience] less tardive diskinesia."
On cross-examination, the doctor testified that he had observed some of respondent's symptoms such as episodic agitation and being withdrawn, but he never observed her hallucinating or being delusional. He stated that those symptoms were witnessed by respondent's mother. He also admitted that other than the incident with the staff member two weeks before the trial, respondent was never physically aggressive with any of the staff members.
During redirect examination of the doctor, respondent stipulated that at the time of her commitment hearing, her husband had obtained an order of protection against her with respect to him and their daughter.
At respondent's request, an independent report was completed by Dr. Shabbir Zarif, who based his findings on a single interview with her and her inpatient hospital chart. He reported that respondent was *215 mostly cooperative during the interview, but would not give him permission to talk to family members or hospital staff regarding her symptoms. His report stated in part:
"Review of progress notes in chart revealed that the patient was admitted for aggressive behaviors towards mother and destroying property. She was reportedly not sleeping well and talking to herself. Admission notes also describe her having `bizarre behaviors' in the ER (`suddenly took all the papers and tore them up and threw them in the garbage can'). Hospital stay progress notes reveal that [respondent] has generally been non-compliant with various offers for treatment including staffing and individual sessions and has often been irritable, hostile, uncooperative and uses strong language. She is reportedly guarded. She was given PRN medications twice in December, once in February for agitation and verbally abusive behaviors. There was no record that I could find of her being put in restraints, nor could I find any documentation that she had assaulted anyone though she has threatened to. There was no documentation of her threatening to assault her family members. There are many notes that she is calm, cooperative though isolative."
His impression was that her overall insight into her illness was poor, that she was in "very high denial of all of her behavior problems especially the aggressive acts" and that as a result she exhibited poor judgment with respect to improving that aspect of her life. He diagnosed respondent as suffering from paranoid schizophrenia, stating:
"[I]n summary we have a [41-year-old African American] lady with a very good personal premorbid history but with a family history of affective disorder who has had somewhat late onset behavior problems which are manifested most overtly by affective lability, aggression and delusional thinking. The core of the behaviors seems centered around family and so family dysfunction cannot be ruled out. Regardless of etiology, she has a history of threatening her family and that possibility remains in the future, unless treatment is instituted. On the other side, [respondent] appears capable of independent functioning and able to take care of herself. It is quite possible that her functioning outside the context of her psychosis is good."
In his recommendations, the doctor stated, "The patient clearly is in need for a more detailed evaluation and treatment." He further stated that if respondent was discharged without treatment and exposed to the same environment as before her admission to the hospital, she would have been at high risk for repeated aggression. He then stated:
"In my opinion * * * I feel that less restrictive measures * * * may be implemented, under court order, rather than just prescribe involuntary medications. Patient's non responsiveness with these measures would then constitute a compelling argument for involuntary medications."
At the conclusion of the trial, the court stated:
"Now, I have a problem here. I might have to ask the doctor a couple more questions because, first of all, I believe that all the testimony is clear and convincing that, and the State has, basically proved that she should have, sheI should authorize involuntary treatment.
But, and I believe what the doctor said that she would best benefit from a combination of medication and then after she's medicated, then she would take *216 advantage of the other service that had been offered to her.
What I'm not comfortable with and I'm not a doctor so I don't know about this, but I don't feel comfortable at all authorizing the use of Haldol for her. Now he mentioned a couple of other medications, Zyprexa or Olanzapine and I don't know what the, I don't know if they have the same side effects.
Now I understand his estimation of the difference between the dystonic reaction and the tardive diskinesia, but I stillI still don't feel comfortable asking her to take Haldol again."
When the court asked the doctor to suggest a medication with lesser side effects, he responded:
"Now Haldol was recommended because we thought if she's refused to go take the medication by mouth, then of course this comes in injectable from. But we can always give her Haldol maybe for a few days and then switch her to something like Olanzapine or Risperdal which is a medication."
The court responded:
"I don't even then want to see her get that muscle tightening for five minutes, even if you can give her the Cogentin and it will ease it. I'm trying to see if you can get the result you want without having her go through that."
When the doctor told the court that Zyprexa would afford respondent the same benefit without the side effects of Haldol, the court stated:
"Then what I'm going to propose then is that the Haldol be the alternative medication and that they start off trying her with the other medicines that don't have the same side effects. And if not, she then refuses those others, then if you need to, then the Haldol. But the Haldol as the medicines [sic] last resort."
The court entered an order providing that for a period not exceeding 90 days, Dr. Ballal was permitted to administer the following medications to respondent: Olanzapine, Prolixin, Haldol and Cogentin. The order also specified the range of doses for the medications, but did not state any limitations on the administration of Haldol.
Although respondent asked the trial court to stay the order, the court denied her request. Because the effect of the court order expired 90 days later on July 17, 2001, respondent's appeal would ordinarily be considered moot. However, pursuant to In re Barbara H., 183 Ill.2d 482, 234 Ill.Dec. 215, 702 N.E.2d 555 (1998), and In re Jennifer H., 333 Ill.App.3d 427, 266 Ill.Dec. 776, 775 N.E.2d 616 (2002), "where a case involves an event of short duration that is capable of repetition, yet evading review, it qualifies for review even if it otherwise would be moot." Jennifer, 333 Ill.App.3d at 430, 266 Ill.Dec. 776, 775 N.E.2d 616. In such a case, the appellate order is in the nature of an advisory ruling. Jennifer, 333 Ill.App.3d at 430, 266 Ill.Dec. 776, 775 N.E.2d 616. Where, as here, a respondent's history of mental illness makes it likely that she will be subjected to involuntary treatment again, we have authority to consider the respondent's appeal under the mootness exception found in Barbara H. and Jennifer H.
On appeal, respondent contends that contrary to section 2-107.1(a)(4) of the Mental Health and Developmental Disabilities Code (Code) (405 ILCS 5/2 107.1(a)(4) (West 2000)), the State failed to prove that she had suffered or exhibited a deterioration of her ability to function which warranted a court order to compel her to submit to involuntary psychotropic medication. She asserts that neither Dr. Ballal nor Dr. Zarif testified that he observed *217 any overt symptoms of such deterioration; nor did either observe any symptoms of paranoia, finding her to be oriented as to persons, place and time and generally pleasant. She further asserts that the State failed to prove that the benefits of the psychotropic medication to respondent outweighed the side effects of the medication and the loss of her "bodily autonomy." She states that because the State did not prove that she was incapable of making her own decisions about taking the medication, the court improperly denied her the right to refuse the medication. She further asserts that "the court disregarded the existence of less restrictive alternative treatments that were specified in the evidence."
Section 2 107.1(a)(4) of the Code provides as follows:
"(4) Authorized involuntary treatment shall not be administered to the recipient unless it has been determined by clear and convincing evidence that all of the following factors are present:
(A) That the recipient has a serious mental illness or developmental disability.
(B) That because of said mental illness or developmental disability, the recipient exhibits any one of the following: (i) deterioration of his ability to function, (ii) suffering, (iii) threatening behavior, or (iv) disruptive behavior.
(C) That the illness or disability has existed for a period marked by the continuing presence of the symptoms set forth in item (B) of this subdivision (4) or the repeated episodic occurrence of these symptoms.
(D) That the benefits of the treatment outweigh the harm.
(E) That the recipient lacks the capacity to make a reasoned decision about the treatment.
(F) That other less restrictive services have been explored and found inappropriate.
(G) If the petition seeks authorization for testing and other procedures, that such testing and procedures are essential for the safe and effective administration of the treatment." 405 ILCS 5/2 107.1(a)(4) (West 2000).
A physician's opinion that a respondent is suffering from a mental illness "must have a sufficient factual basis, but, as a matter of law, there need not be independent substantive evidence in order for such an opinion to be `clear and convincing.'" In re Tuman, 268 Ill.App.3d 106, 110, 205 Ill.Dec. 840, 644 N.E.2d 56 (1994). However, where the physician's opinion is supported by his review of hospital records or the testimony of witnesses which the State has not brought before the trial court, this "court must carefully evaluate all evidence presented by the State to determine whether it is `clear and convincing.'" Tuman, 268 Ill.App.3d at 111, 205 Ill.Dec. 840, 644 N.E.2d 56. A physician's opinion may comprise clear and convincing evidence if his diagnosis is based on his personal observations of a respondent on several occasions. Tuman, 268 Ill.App.3d at 111, 205 Ill.Dec. 840, 644 N.E.2d 56.
Here, Dr. Ballal testified that he had observed respondent five days a week for several months and although he never saw her hallucinating or manifesting physical aggression, he did observe symptoms of episodic agitation and being withdrawn. Both he and Dr. Zarif based their diagnoses in part on the hospital records and, although they have not been made a part of the appellate record, Dr. Zarif's summary of those records in his report gives us a general description of the behavior which led to respondent's hospitalization. We find that their diagnoses were supported *218 by a factual basis sufficient to be considered clear and convincing evidence. Accordingly, we find that the trial court did not err in determining that respondent had a serious mental illness and that she exhibited deterioration of her ability to function and threatening behavior.
However, we find that the State presented little or no evidence of the continuing presence of these symptoms after her hospitalization, and presented only one instance of a "repeated episodic occurrence" of threatening behavior which was triggered by outward circumstances. Additionally, we find that the State did not present any evidence that respondent lacked the capacity to make a reasoned decision about her treatment. Instead, the record shows that while hospitalized, respondent functioned at a high level, was alert, polite, and oriented to time and place. Dr. Zarif found her to appear capable of independent functioning and able to care for herself. Dr. Ballal admitted that he never observed any delusional or hallucinatory behavior and that such behavior was only reported by respondent's mother. Furthermore, although both doctors stated that respondent possessed no insight into her mental illness and did not believe that she needed treatment, we find that because the evidence failed to show that her symptoms continued after her hospitalization, her alleged lack of insight did not alone prove that she was incapable of making a reasoned decision about her treatment.
We also find that the State did not show that under these circumstances, the benefits of the suggested medications outweighed their potential harm to respondent.
For these reasons, we find that pursuant to section 2 107.1(a)(4) of the Code, the State did not present clear and convincing evidence of all of the factors required to prove that respondent's condition necessitated involuntary treatment.
The judgment of the circuit court of Cook County is reversed.
Reversed.
GALLAGHER and FROSSARD, JJ., concur.