NOTICE
Decision filed 05/31/16. The text of this decision may be changed or corrected prior to the filing of a Peti ion for Rehearing or the disposition of the same.

2016 IL App (5th) 130573

NO. 5-13-0573

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| *In re* DEBRA B., Alleged to Be a Person Subject to Involuntary Treatment With Psychotropic Medication | ) ) ) ) | Appeal from the Circuit Court of Madison County. |
| (The People of the State of Illinois, Petitioner-Appellee, v. Debra B., Respondent-Appellant). | ) ) | No. 13-MH-156 |
| | ) ) ) | Honorable Thomas W. Chapman, Judge, presiding. |

_____

JUSTICE CHAPMAN delivered the judgment of the court, with opinion.

Presiding Justice Schwarm and Justice Stewart concurred in the judgment and opinion.

**OPINION**

¶ 1    The respondent, Debra B., appeals a trial court order authorizing the involuntary administration of psychotropic medication to her. See 405 ILCS 5/2-107.1 (West 2012). She argues that the State failed to prove by clear and convincing evidence that (1) she was suffering as a result of her mental illness; or (2) her ability to function had deteriorated since the onset of her symptoms. She also argues that the State failed to prove that she was unable to make a reasoned decision regarding the medications because the record does not establish that she was informed about alternatives to medication. The State argues that we should dismiss this appeal because it is moot. We find that review is

1

appropriate under the public-interest exception to the mootness doctrine, and we reverse the trial court's order.

¶ 2     Debra B. has a lengthy mental health history.  Although the record does not contain a detailed history, Debra's treating psychiatrist indicated that Debra was previously admitted for treatment in a mental health facility multiple times, including both voluntary and involuntary admissions.  She was first admitted to a facility in the mid-1980s.  There was some evidence to suggest that she was able to function reasonably well between hospitalizations, at least some of the time.  She testified that she owned her own home, raised a daughter alone, and cared for her elderly mother and several pets.

¶ 3     In 2013, Debra B. was found unfit to stand trial on a charge of aggravated battery.  On October 2, 2013, she was admitted to the forensic unit at Alton Mental Health Center (Alton).  Her previous admissions were all to the civil unit.  On October 21, Dr. Jagannath Patil became Debra's treating psychiatrist.  On October 25, he filed a document with the trial court entitled "petition and affidavit for involuntary administration of psychotropic medication."

¶ 4     On November 5, 2013, the court held a hearing on the petition.  Dr. Patil testified that Debra B. had been diagnosed with bipolar disorder, manic with psychotic symptoms.  He explained that her symptoms included racing thoughts, pressured speech, increased psychomotor activity, florid mania, and grandiose delusions.  Among her delusions, Debra believed that she was a home-educated medical doctor, the queen of Czechoslovakia, and "smarter than anyone around."  Dr. Patil testified that Debra had a

2

history of asthma, head trauma, and substance abuse. He noted that he did not know her entire medical history.

¶ 5 Dr. Patil testified that Debra was sleeping adequately since he began administering medication to her on an emergency basis. He did not provide any information concerning how little sleep she was getting prior to being medicated, nor did he provide any information on how this affected Debra.

¶ 6 Dr. Patil was asked if he believed that Debra B. had experienced a deterioration in her ability to function. See 405 ILCS 5/2-107.1(a-5)(4)(B)(i) (West 2012). He responded, "Yes." Asked to elaborate, Dr. Patil testified that she engaged in intrusive behavior towards staff and other patients. He explained, "She has been into everyone's business on the unit." Asked to be more specific about Debra being intrusive and "into the business" of other patients, Dr. Patil stated, "She always aggravates the peers. Talks to them." He testified that Debra accused other patients "of phone sex and things." He noted that these behaviors had improved with the administration of medication on an emergency basis.

¶ 7 Dr. Patil was then asked if he believed that Debra B. was suffering. See 405 ILCS 5/2-107.1(a-5)(4)(B)(ii) (West 2012). He replied, "Yes, she is." Asked to explain why he believed Debra was suffering, he explained, "All the symptoms that she exhibited is a suffering basically. She cannot function because of the suffering of these symptoms." Dr. Patil noted that Debra "writes numerous papers" which "indicate that she is suffering." He stated that she was "incessantly writing." He then described the content of some of Debra's writings. We note that the writings themselves were not admitted into

3

evidence, and it is not clear from Dr. Patil's testimony whether he was reading from these writings as he testified or describing them from memory.

¶ 8    Dr. Patil first described a paper Debra wrote which was received by a staff member on October 17, 2013.  In it, Debra wrote, "Respect.  Learn the Ten Commandments.  I am the Lord.  God will not put any God in front of me."  The letter went on to recite some of the Ten Commandments.  It ended, "I am tired of this bullshit.  Get it together.  You have been warned."  It was signed by "God."  Dr. Patil described another letter from the same date.  In it, Debra wrote, "God is love."  She went on to write, "I died for your sins.  So did I."  The letter was signed, "The Mother of the Holy Ghost."  Dr. Patil next described an October 18 letter in which Debra wrote, "Welcome to hell or heaven.  It is what you make it."  This letter was signed, "Signed the Holy Ghost.  Yours truly, Witchpoo."

¶ 9    Dr. Patil next described an October 23 letter Debra wrote to Prince William and Kate Middleton congratulating them on the christening of their son.  She wrote, "I wish I could be there to give little George Alexander gifts," and, "Tell Dad hello."  She signed the letter as "Queen Debra of Czechoslovakia."  In a postscript, she stated that she hoped to see Prince George before he learned to walk, that it was difficult for her to keep in touch because she had no computer, and that her mother had undergone eye surgery the previous week.

¶ 10   Finally, Dr. Patil described an October 23 letter Debra wrote to the St. Louis Cardinals.  In it, she wrote, "I just want the Cardinals to absolutely know that they are unconquerable."  She also wrote, "Numbers don't lie.  Neither does the Bible.  *** They

4

will never be able to outrun his love." Dr. Patil indicated that Debra asked staff members to mail this letter to the Cardinals.

¶ 11 Dr. Patil was asked, "So these letters *** cause you to understand that she is suffering?" He replied, "She is suffering."

¶ 12 Dr. Patil was next asked about Debra B.'s ability to make a reasoned decision about whether to take medication. See 405 ILCS 5/2-107.1(a-5)(4)(E) (West 2012). He testified that she was not able to make a reasoned decision because she did not believe that she had a mental illness. He acknowledged that, although Debra did not recognize that she suffers from bipolar disorder, she did recognize that she suffers from posttraumatic stress disorder and that she had been diagnosed with head trauma. Dr. Patil indicated that he explained to Debra the benefits and risks of all of the medications he proposed administering to her. He also provided her with written information about the medications. He acknowledged that Debra was well-educated and of normal to above normal intelligence. He further acknowledged that she was capable of reviewing this information. Dr. Patil noted that Debra had been given several different types of psychotropic medications in the past. Notably, however, Dr. Patil did not testify either that he discussed alternative forms of treatment with Debra or that he provided her with any written information regarding alternative forms of treatment.

¶ 13 Dr. Patil testified that less restrictive forms of treatment–such as therapy, education, and redirection–had been attempted unsuccessfully. He acknowledged that Debra willingly participated in these types of treatment. However, he opined that these treatment options would only be effective if used in conjunction with medication. He

5

further noted that counseling in a group setting was not appropriate for Debra because of the severity of her symptoms.

¶ 14    Dr. Patil testified that Debra B. had not exhibited any threatening behaviors since being admitted to Alton.  See 405 ILCS 5/2-107.1(a-5)(4)(B)(iii) (West 2012).  He noted, however, that she "put her[self] in a dangerous situation because of many behaviors" involving "getting in the business" of other patients.  He further noted that while she was at the St. Clair County jail prior to her admission, Debra exhibited "suicidal ideations and manic symptoms" and "threatened the officer and his family."

¶ 15    Debra B. also testified.  She stated that she had no desire to harm anyone, including herself.  She was aware that she had been diagnosed with posttraumatic stress disorder and head trauma.  She stated, however, that she was "not suffering from it at this time."  In addition, Debra denied that she suffered from bipolar disorder.  She testified that she was involuntarily admitted to Alton in 1996 only because her husband "made [her] look bipolar" because he did not want her "to take anything that [she] had worked for."  Debra testified that she was willing to participate in therapy.  She further testified that she considered writing to be a form of therapy, noting that she kept a journal.

¶ 16    Debra B. explained her unwillingness to take medication as follows: "I don't feel like I need medication. I'm a psychologist. I've got my Ph.D. I feel like I do not deserve to have to take this medication.  I've had cancer.  I've got glaucoma.  I've got osteoarthritis.  I don't need these medications to make my illnesses worse."  She further explained that the medication being administered to her on an emergency basis made her so tired that she was "sleeping around the clock."  She stated that before being medicated,

she slept six to eight hours per night. As a result, she testified, she was often too tired to eat or take a shower.

¶ 17 Debra's attorney asked her if she was refusing to take medication because she believed it would cause her to suffer. In response, Debra testified that she was suffering because she was at Alton. She explained that she missed her 20-year-old daughter and worried that her daughter would not be able to handle taking care of Debra's three-story house, 75-year-old mother, four dogs, and two cats. Debra testified that she believed the medication would cause her to suffer more.

¶ 18 Following the hearing, the court entered an order authorizing the involuntary administration of psychotropic medications to Debra B. The court found that the State had not proved that Debra exhibited threatening behavior. However, the court found by clear and convincing evidence that she was suffering, that her ability to function had deteriorated, and that she lacked the capacity to make a reasoned decision regarding her treatment. Debra B. timely filed the instant appeal challenging that order.

¶ 19 Before addressing the merits of Debra's arguments, we must first address the State's argument that we should dismiss this appeal. As the State correctly contends, this appeal is technically moot. The order authorizing the involuntary administration of medication to Debra B. was entered on November 5, 2013, and expired 90 days later. See 405 ILCS 5/2-107.1(a-5)(5) (West 2012). It is therefore impossible for this court to grant her effective relief from that order. See *In re Joseph M.*, 398 Ill. App. 3d 1086, 1087 (2010). This fact means that our decision in this matter is "essentially an advisory opinion." *In re Evelyn S.*, 337 Ill. App. 3d 1096, 1101 (2003). This court does not have

7

jurisdiction to decide a moot question or render an advisory opinion unless the case falls within an exception to the mootness doctrine. *In re Alfred H.H.*, 233 Ill. 2d 345, 351 (2009). Mental health cases "usually fall within one of the established exceptions to the mootness doctrine." *Id*. at 355. However, "there is no *per se* exception" applicable to all mental health cases. *Id*. Instead, we must decide on a case-by-case basis whether one of the recognized exceptions applies. *Id*.

¶ 20 One such exception is the public-interest exception. Under the public-interest exception, we may consider an otherwise moot appeal if (1) the case presents a question of a public nature; (2) there is a need for an authoritative determination to guide public officials; and (3) it is likely that the question will recur. *Id*. All three of these criteria must be met for the exception to apply. *Id*. at 355-56.

¶ 21 We find that the instant case meets all three criteria. First, we have long recognized that the procedures a court must follow before it may "authorize the involuntary medication of mental health patients are a matter of 'substantial public concern.' " *In re Evelyn S.*, 337 Ill. App. 3d at 1102 (quoting *In re Mary Ann P*., 202 Ill. 2d 393, 402 (2002)). This does not mean that *all* mental health cases raise questions of a public nature. As our supreme court has explained, cases challenging the sufficiency of the evidence "are inherently case-specific," as a result of which such cases *usually* "do not present the kinds of broad public[-]interest issues" presented by most other mental health cases. *In re Alfred H.H*., 233 Ill. 2d at 356-57. It is important to emphasize that the court did *not* hold that a sufficiency-of-the-evidence claim will *never* involve the type

8

of public concerns necessary to bring it within the public-interest exception. See *In re Joseph M.*, 405 Ill. App. 3d 1167, 1173 (2010).

¶ 22    Although the instant case involves a challenge to the sufficiency of the evidence, we believe that the questions raised by Debra B. have "broader implications than most sufficiency-of-the-evidence claims" (*id.*). As we will discuss, Debra does not merely ask us to assess the strength of the particular evidence presented here. Instead, she argues that the court's order was flawed because Dr. Patil's testimony addressed the fact that she was "suffering from" symptoms of a mental illness without addressing how she was "suffering" as a result. She also argues that the State was required to prove that there was some physical manifestation to her suffering. Similarly, she argues that the State must demonstrate that her symptoms are adversely impacting her ability to take care of her health or safety before a court may find that her ability to function has deteriorated. These questions relate to the substance of what the State must demonstrate in order to prove that involuntary medication is warranted. We find this to be a matter of great public concern. Thus, the first criterion is met in this case.

¶ 23    Second, we believe that a definitive decision is needed to provide guidance. As Debra points out, only two appellate decisions squarely address the question of what constitutes "suffering" sufficient to warrant involuntary medication–*In re Wendy T.*, 406 Ill. App. 3d 185 (2010), *overruled on other grounds by In re Rita P.*, 2014 IL 115798, ¶¶ 33-34; *In re Lisa P.*, 381 Ill. App. 3d 1087 (2008). Third, because of the short duration of orders authorizing the involuntary administration of psychotropic medication, the questions presented in this appeal are likely to recur without the opportunity to be fully

9

litigated before becoming moot.  See *In re Mary Ann P.*, 202 Ill. 2d at 402-03; *In re Evelyn S.*, 337 Ill. App. 3d at 1102.  We will therefore consider Debra B.'s arguments under the public-interest exception.

¶ 24    In order for a respondent to be subject to the involuntary administration of psychotropic medication, the State must show by clear and convincing evidence that (1) the respondent suffers from a serious mental illness (405 ILCS 5/2-107.1(a-5)(4)(A) (West 2012)); (2) the benefit of the medication outweighs the harm (405 ILCS 5/2-107.1(a-5)(4)(D) (West 2012)); and (3) other less restrictive types of treatment have been explored and found to be inappropriate (405 ILCS 5/2-107.1(a-5)(4)(F) (West 2012)).  In addition, the State must show that, as a result of the respondent's mental illness, at least one of the following is true: (1) she is suffering; (2) there has been a deterioration in her ability to function; or (3) she is exhibiting threatening behavior.  405 ILCS 5/2-107.1(a-5)(4)(B) (West 2012).  Finally, the State must also prove that the respondent lacks the capacity to make a reasoned decision about whether to take the medication.  405 ILCS 5/2-107.1(a-5)(4)(E) (West 2012).  In this case, the only questions are whether the State proved that Debra B. lacked the capacity to make a reasoned decision and whether it proved either that she was suffering or that her ability to function had deteriorated.  We review the court's factual findings to determine whether they were against the manifest weight of the evidence.  *In re Wendy T.*, 406 Ill. App. 3d at 192.

¶ 25    Debra's first contention is that the State failed to demonstrate that she lacked the capacity to make a reasoned decision regarding the medications because it failed to prove

she was provided with written information regarding reasonable alternatives to medication. See 405 ILCS 5/2-102(a-5) (West 2012). We agree.

¶ 26 Proof that a respondent has been advised and given written information about alternatives to medication is crucial for two reasons. First, this is explicitly required under the Mental Health and Developmental Disabilities Code (Mental Health Code). 405 ILCS 5/2-102(a-5) (West 2012). Strict compliance with the procedural safeguards found in the Mental Health Code is essential in order to protect the rights of patients. *In re John R.*, 339 Ill. App. 3d 778, 785 (2003). Failure to comply with this requirement is a sufficient basis to reverse an order authorizing involuntary treatment. *In re Bobby F.*, 2012 IL App (5th) 110214, ¶ 20; *In re Nicholas L.*, 407 Ill. App. 3d 1061, 1073 (2011).

¶ 27 Second, adequate proof that a respondent has been provided with all of the information necessary to make a reasoned decision is crucial to a determination concerning the respondent's capacity to make such a decision. *In re Bobby F.*, 2012 IL App (5th) 110214, ¶ 18 (quoting *In re John R.*, 339 Ill. App. 3d at 783). Respondents in mental health cases are presumed to be competent to make decisions regarding their care. *In re Michael H.*, 392 Ill. App. 3d 965, 974 (2009) (citing 405 ILCS 5/2-101 (West 2006)). If the respondent has the capacity to make decisions regarding her care, she has the right to refuse to be medicated even if the medication is "clearly in that individual's best interests." *In re John R.*, 339 Ill. App. 3d at 782-83. A respondent has the capacity to make reasoned decisions regarding her treatment if, "*based upon the conveyed information* concerning the side effects, risks, benefits, *and reasonable alternatives* to the proposed treatment, [she] makes a reasoned choice to either accept or refuse the

11

treatment." (Emphases added.) *In re Bobby F.*, 2012 IL App (5th) 110214, ¶ 18. It would be at odds with these principles to allow a court to find that a respondent lacks the capacity to make a reasoned decision without evidence that the respondent has all the information necessary to make such a decision. See *In re Steven T.*, 2014 IL App (5th) 130328, ¶ 14; *In re John R.*, 339 Ill. App. 3d at 783.

¶ 28    As we stated earlier, Dr. Patil testified that he gave Debra B. the required written information about the medications he proposed giving her. He also testified that he gave her written information about the medications he proposed administering to her if his preferred medications were ineffective or produced serious side effects. He did not, however, testify that he discussed with Debra or provided her with any written information regarding alternatives to medication. Thus, there was no information in the record to allow the court to conclude that Debra had been provided with this information.

¶ 29    The State calls our attention to the petition and affidavit filed by Dr. Patil. That document appears to be a preprinted form. One provision states, "I have explained the risks and the intended benefits of the treatment, as well as alternative forms of the treatment, to the recipient." Dr. Patil checked a box marked "Yes" after this statement. The next provision states, "And I also have provided that information in written or printed form to the recipient." Again, Dr. Patil checked the box marked "Yes" after the statement. The document was filed with the court, but it was not entered into evidence. The State argues that the petition and affidavit provided sufficient proof to rebut any claim that Dr. Patil did not provide Debra B. with the requisite information. We disagree.

¶ 30    Although the State cites no authority in support of its contention, we acknowledge that the Third District found that a supporting affidavit filed with the petition constituted "uncontroverted evidence" that the treating psychiatrist provided the necessary information to the respondent regarding the risks and benefits of the proposed medication. *In re E.F.*, 2014 IL App (3d) 130814, ¶ 59. (We note parenthetically that the *In re E.F.* court nevertheless reversed the order because it found no indication that the State had provided the respondent with written information about alternatives to medication. *Id.* ¶ 60.) However, this court has repeatedly held that allegations in a petition and information in supporting documents are not sufficient to support an order authorizing involuntary treatment if they are not admitted into evidence. See *In re Bobby F.*, 2012 IL App (5th) 110214, ¶¶ 22-23; *In re Phillip E.*, 385 Ill. App. 3d 278, 284 (2008). We note that the Fourth District has consistently reached the same conclusion. See *In re A.W.*, 381 Ill. App. 3d 950, 957 (2008); *In re Louis S.*, 361 Ill. App. 3d 774, 780 (2005). This is because we must decide the sufficiency of the evidence based solely on the evidence presented at the hearing. *In re Bobby F.*, 2012 IL App (5th) 110214, ¶ 23 (quoting *In re Laura H.*, 404 Ill. App. 3d 286, 291 (2010)). Here, evidence that Debra received the necessary information may well have existed, but it was not admitted into evidence at the hearing.

¶ 31    The State also argues that because Dr. Patil testified that alternative forms of therapy were not effective, "there were no appropriate alternatives" about which to inform Debra B. In support of this contention, the State cites *In re Vanessa K.*, 2011 IL

13

App (3d) 100545.  We find *In re Vanessa K.* distinguishable because it did not address the precise issue before us in this case.

¶ 32    There, Vanessa K.'s treating psychiatrist filed a petition to involuntarily administer psychotropic medication to Vanessa.  Specifically, he sought authority to administer Risperdal, an antipsychotic.  He listed 20 different medications as alternatives.  *Id*. ¶ 3.  Among the 20 alternative medications he proposed was Prolixin (*id*.), an antipsychotic medication that Vanessa had taken in the past which had been effective (*id*. ¶ 23).  At a hearing on the petition, the psychiatrist testified that subsequent to filing the petition, he determined that Prolixin would be a better drug for Vanessa than Risperdal.  *Id*.  He explained that when he filed the petition, he was not aware that Vanessa had used Prolixin in the past.  *Id*. ¶ 8.

¶ 33    Based on this testimony, the trial court determined that the petition should be amended to substitute Prolixin as the primary medication.  *Id*. ¶ 9.  Both parties objected. The court adjourned for 10 minutes, advising the parties to decide whether they wanted to amend the petition.  *Id*.  During the 10-minute break, the psychiatrist provided both oral and written information to Vanessa about the benefits, risks, and possible side effects of Prolixin, and he testified to this fact when court reconvened.  *Id*.  Prior to the break, he acknowledged that he had not previously given Vanessa the required written information. *Id*. ¶ 8.

¶ 34    On appeal, Vanessa did not contend that her doctor failed to provide her with information about alternatives to medication.  Instead, she argued that the order authorizing treatment "must be reversed *because she was not provided written*

*information about all the medication approved for adminstration by the court*, noting the lengthy list of alternative medications attached to the order." (Emphasis added.) *Id.* ¶ 21. In rejecting this argument, the Third District noted that "there was no need to provide information on all the medications listed as alternatives in the attachment" because Vanessa's doctor "did not consider them to be viable options." *Id.* ¶ 23. This is the language relied upon by the State to support its position in this case. More importantly, however, the *In re Vanessa K.* court twice emphasized that the trial court's order did not authorize the administration of any drug other than Prolixin. *Id.* This fact negated Vanessa's claim that she did not receive written information on all of the medications authorized by the court. We have already concluded that the State's failure to offer evidence that Dr. Patil provided Debra with oral or written information about alternative forms of treatment requires reversal. *In re Vanessa K.* does not require us to reach a different result.

¶ 35    Debra next argues that the State did not prove either that she was suffering or that her ability to function had deteriorated since the onset of her symptoms. As the State correctly notes, it was only required to prove one of these propositions. See *In re Lisa P.*, 381 Ill. App. 3d at 1095. We will address these arguments in turn; however, we will first discuss the principles applicable to both questions.

¶ 36    We begin by emphasizing the importance of the rights at stake. As Illinois courts have repeatedly stated, "the involuntary administration of psychotropic drugs involves a 'massive curtailment of liberty.' " (Internal quotation marks omitted.) *In re Joseph M.*, 398 Ill. App. 3d at 1089-90 (quoting *In re Robert S.*, 213 Ill. 2d 30, 46 (2004), quoting *In*

15

*re Barbara H.*, 183 Ill. 2d 482, 496 (1998), quoting *Vitek v. Jones*, 445 U.S. 480, 491 (1980)). The right to refuse these medications is among "the 'liberty' interests recognized in constitutional jurisprudence." *In re C.E.*, 161 Ill. 2d 200, 213 (1994). There are "[t]wo fundamental concerns" that underscore the importance of protecting this right. *Id.* at 214. Our first concern is "the substantially invasive nature of psychotropic substances and their significant side effects." *Id.* Our second concern is the potential for these drugs to be used for patient management and control rather than for treatment. *Id.* at 215. Thus, even during involuntary admissions, a mental health patient retains the right "to remain free from unwarranted intrusions into [her] body and mind." *In re Orr*, 176 Ill. App. 3d 498, 512 (1988) (citing *Mills v. Rogers*, 457 U.S. 291, 299 (1982)). For this reason, we believe it is imperative that before a respondent may be forced to take psychotropic medication against her will, the State must prove something more than the fact that a patient is mentally ill or the fact that the patient is subject to involuntary admission because of her illness.

¶ 37 In addition, we reiterate that the State must prove that involuntary medication is appropriate by clear and convincing evidence. This standard requires the State to present expert medical testimony. See *In re Joseph M.*, 398 Ill. App. 3d at 1090. Generally, the testimony of an expert medical witness coupled with the court's observation of the respondent is sufficient to meet this standard. *In re Perona*, 294 Ill. App. 3d 755, 766 (1998). However, expert testimony is *not* sufficient unless the medical expert testifies to specific facts to support his opinions. See *In re Joseph M.*, 398 Ill. App. 3d at 1090. With these principles in mind, we turn to the parties' contentions.

16

¶ 38    In support of her contention that the State did not meet its burden of proving that she was suffering, Debra points out that the Mental Health Code does not define the term "suffering."   As such, she correctly contends, we must give the word its plain and ordinary meaning.  See *Cojeunaze Nursing Center v. Lumpkin*, 260 Ill. App. 3d 1024, 1029 (1994).   She further contends that the dictionary definitions of suffering include physical, mental, and emotional pain or distress.  See Webster's Ninth New Collegiate Dictionary 1179 (1988) (defining suffering as "pain" and noting that "distress" is a synonym); Black's Law Dictionary 1109 (6th ed. 1990) (defining "pain and suffering" as a "[t]erm used to describe not only physical discomfort and distress but also mental and emotional trauma").  Thus, to prove that a respondent is suffering, the State must show that she is experiencing physical pain or emotional distress.  As we will explain, we agree with Debra that Dr. Patil's testimony did not support such a finding.

¶ 39    Debra calls our attention to the cases of *In re Wendy T.* and *In re Lisa P.*  In *In re Wendy T.*, the respondent's illness resulted in disorganized thinking.   This made it impossible for her to carry on ordinary conversations, process what other people said to her, or make decisions.   *In re Wendy T.*, 406 Ill. App. 3d at 187-88.   Her treating psychiatrist testified that Wendy T. often became angry because she was unable to effectively communicate, and that she was unable to perform "simple tasks that the average person could easily perform."   *Id*. at 188.   On appeal, the court found this testimony sufficient to support a finding that Wendy T. was suffering.  *Id*. at 194.

¶ 40    In *In re Lisa P.*, the treating psychiatrist testified that Lisa P. experienced rage and paranoia as a result of her mental illness.  *In re Lisa P.*, 381 Ill. App. 3d at 1090.  The

17

psychiatrist further testified that Lisa P. "believed that her entire family was 'after [her],' that the world was evil, and that she was a victim." *Id*. In addition, the trial judge observed Lisa P. during the hearings, and he noted that she appeared to be suffering every time he saw her in court. *Id*. at 1091. On appeal, the court found this evidence sufficient to uphold the trial court's finding that she was suffering. *Id*. at 1095.

¶ 41 There are two significant distinctions between both of these cases and the case before us. First, both cases included at least *some* evidence that the respondents were suffering beyond a mere recitation of their symptoms. As just discussed, there was testimony that Wendy T. was often angry because of her inability to communicate (*In re Wendy T.*, 406 Ill. App. 3d at 188) and that Lisa P. experienced rage, an intense negative emotion (*In re Lisa P.*, 381 Ill. App. 3d at 1090). In addition, Lisa P.'s demeanor in court led the trial judge to believe she was suffering. *Id*. at 1091. The record in this case contains no similar evidence.

¶ 42 Second, the symptoms experienced by both Wendy T. and Lisa P. lead more readily to an inference that they were suffering than do the symptoms described by Dr. Patil here. Wendy T.'s inability to manage even the simplest of tasks and her inability to effectively communicate would obviously lead to a great deal of frustration. Lisa P.'s extreme paranoia–particularly her belief that everyone, including her own family, was out to get her–would cause anyone to feel isolated and fearful. The nexus in this case is less obvious.

¶ 43 Debra argues that absent the "obvious signs of either extreme paranoia or inability to carry out simple tasks" that were present in *In re Wendy T*. and *In re Lisa P*., the State

18

must provide some evidence of "the physical manifestations" of suffering. She notes that such evidence might include testimony that the respondent is exhibiting "the common physical manifestations of suffering in depression, such as crying, insomnia, changes in appetite, or other digestive disorders."

¶ 44 Although we do not believe that evidence of physical manifestations of depression is necessary to meet the clear-and-convincing standard, we do believe that the State must provide some factual basis for an assertion that a respondent is suffering. For example, the medical expert might testify that the respondent has reported feeling sorrow, frustration, anger, anxiety, or some other intense negative emotion, or that the respondent has behaved in a manner that indicates she is experiencing some sort of emotional anguish. No such evidence was present in the instant case.

¶ 45 As discussed previously, Dr. Patil testified that he believed Debra was suffering. When asked to elaborate, he simply described her grandiose delusions and other symptoms. He did not provide any insight into why he believed these symptoms caused her to suffer. That is, he did not explain how these symptoms caused her to feel grief, anxiety, depression, or any other type of emotional distress. He did not even specifically testify that Debra actually felt any of these emotions. To hold that Dr. Patil's testimony here was sufficient to establish suffering would be tantamount to holding that any patient with a serious mental illness is subject to involuntary administration of medication. Such a holding would be untenable.

¶ 46 We note that Dr. Patil did testify that Debra B. was "sleeping adequately" since he began administering medication to her on an emergency basis. This at least implies that

19

she was experiencing some difficulty in sleeping without the medication. Debra refers to insomnia as a physical manifestation of depression and appears to acknowledge that evidence of insomnia may therefore support a finding that a respondent is suffering. We agree. However, there was no testimony regarding the severity or regularity of any sleep deprivation Debra might have suffered. This does not meet the clear-and-convincing standard.

¶ 47 In addition, we note that, as the State points out, Debra herself used the word "suffering" in her testimony. As discussed previously, she testified that she was suffering because she was in Alton, she missed her daughter, and she was concerned about her daughter's ability to properly manage her home and care for her mother and her pets while Debra was in Alton. This is not the type of "suffering" that can be alleviated by psychotropic medication. In addition, the testimony came in response to a question in which Debra's attorney used the word "suffering." In any case, we do not believe this testimony provides any support for a finding that Debra was suffering. We conclude that the State failed to provide clear and convincing evidence that Debra B. was subject to being medicated against her will because she was suffering.

¶ 48 For similar reasons, we find that the State failed to prove the requisite deterioration in Debra's ability to function. As previously discussed, Dr. Patil offered the somewhat conclusory opinion that Debra's ability to function had deteriorated, and he then described the symptoms of her mental illness. In describing her symptoms, Dr. Patil focused on the fact that she was "into the business" of other patients and was "always aggravating" them by "talking to them." He explained that due to her grandiose

delusions, Debra believed that she was able to help people. Dr. Patil did not elaborate or give examples of how Debra "got into the business" of other patients. He did not testify that she was violent or that she posed a threat to other patients or staff; in fact, he testified to just the opposite.

¶ 49 We find that this testimony falls short of what is necessary to prove the type of deterioration in ability to function sufficient to warrant the involuntary administration of psychotropic medication for two reasons. First, the focus of most of this testimony is on Debra's interactions with other patients. If the main goal in administering psychotropic medication is to modify nonthreatening behavior towards other patients, this raises serious questions concerning whether the medication is being used primarily as a means of managing her behavior rather than as a means of treating her illness. This is precisely the type of misuse our supreme court has warned against. See *In re C.E.*, 161 Ill. 2d at 215.

¶ 50 Second, as we have repeatedly emphasized, before a mental health patient may be medicated against her will, the State must prove more than the fact that she suffers from a serious mental illness. Debra argues that to show deterioration in ability to function, the State must prove that the respondent's behavior endangers her own health or threatens others. While we find this view too constricted, we believe that the State must show a deterioration in the respondent's ability to function on a basic level. See *id.* at 228 (explaining that this statutory language "must be considered in the context of the mental illness or disability from which the mental health recipient is suffering").

21

¶ 51 In this regard, we note that the instant case stands in marked contrast to cases in which courts have upheld the finding that involuntary medication is warranted on the basis of a deterioration in the respondent's ability to function. See, *e.g*., *In re Wendy T*., 406 Ill. App. 3d at 194 (respondent was unable to carry on conversations, carry out even simple tasks, process information, or behave appropriately in court); *In re Lisa P*., 381 Ill. App. 3d at 1096 (respondent exhibited explosive rage and such inappropriate behavior that she had to be physically restrained); *In re M.T*., 371 Ill. App. 3d 318, 320 (2007) (respondent's extreme paranoia led her to stop eating for fear her food was contaminated, barricade the entrance to her home, attempt to heat her home using an oven and a waffle iron instead of her furnace, and refuse food even after admission to a facility); *In re Hannah C*., 367 Ill. App. 3d 1021, 1023 (2006) (respondent's "health was at risk and she was a danger to others"); *In re Perona*, 294 Ill. App. 3d at 766 (patient's inability or unwillingness to remain clothed, disruptive behavior, depression, and loss of appetite showed the deterioration of his ability to function even within the hospital environment).

¶ 52 Here, by contrast, Dr. Patil admitted that Debra was eating properly and was not threatening staff or patients. Although he testified that she aggravated other patients, he did not testify that she was disruptive. He specifically testified that she did not need to be restrained or monitored on a one-on-one basis since her arrival at Alton. Both Debra and Dr. Patil testified that Debra participated in therapy, although Dr. Patil testified that group therapy was inappropriate due to her intrusive behavior. Debra testified that although she was too tired to eat or shower, she forced herself to get up and shower so that she would be permitted to use the "comfort room," which she described as a room with a recliner,

22

small table, puzzles, and stereo. From this evidence, it appears that Debra was able to function reasonably well, at least in the environment of the facility. We therefore conclude that the State did not show the type of deterioration in Debra's ability to function that would support an order for involuntary administration of medication.

¶ 53 Finally, we note that the State asks us to consider Dr. Patil's testimony about Debra's behavior at the jail before her admission. As noted earlier, he testified that she threatened an officer and expressed suicidal ideations. We are not persuaded. The statute explicitly provides that the court must find that the respondent's illness has been "marked by the continuing presence of the symptoms" justifying involuntary medication "or the repeated episodic occurrence of these symptoms." 405 ILCS 5/2-107.1(a-5)(4)(C) (West 2012). Thus, we limit our consideration to the behaviors and symptoms Dr. Patil observed that occurred on an ongoing basis at Alton. Applying these standards, we believe the court's findings that Debra was suffering and that her ability to function had deteriorated were against the manifest weight of the evidence.

¶ 54 For the foregoing reasons, we reverse the order of the trial court finding Debra B. to be subject to the involuntary administration of psychotropic medication.

¶ 55 Reversed.

2016 IL App (5th) 130573

NO. 5-13-0573

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* DEBRA B., Alleged to Be a Person Subject to Involuntary Treatment With Psychotropic Medication | ) ) ) ) | Appeal from the Circuit Court of Madison County. |
| (The People of the State of Illinois, Petitioner-Appellee, v. Debra B., Respondent-Appellant). | ) ) ) ) ) ) | No. 13-MH-156<br><br>Honorable Thomas W. Chapman, Judge, presiding. |

_____

**Opinion Filed:**          May 31, 2016

_____

**Justices:**          Honorable Melissa A. Chapman, J.

Honorable S. Gene Schwarm, P.J., and
Honorable Bruce D. Stewart, J.,
Concur

_____

**Attorneys for Appellant**          Barbara A. Goeben, Staff Attorney, Veronique Baker, Director, Legal Advocacy Service, Guardianship and Advocacy Commission, Metro East Regional Office, 4500 College Avenue, Suite 100, Alton, IL 62002

_____

**Attorneys for Appellee**          Honorable Thomas D. Gibbons, State's Attorney, Madison County Courthouse, 157 N. Main Street, Suite 402, Edwardsville, IL 62025; Patrick Delfino, Director, Stephen E. Norris, Deputy Director, Whitney E. Atkins, Staff Attorney, Office of the State's Attorneys Appellate Prosecutor, Fifth District Office, 730 E. Illinois Highway 15, Suite 2, P.O. Box 2249, Mt. Vernon, IL 62864

_____