# Illinois Official Reports

## Appellate Court

---

### *In re Beverly B.*, 2017 IL App (2d) 160327

---

| | |
|---|---|
| Appellate Court Caption | *In re* BEVERLY B., Alleged to Be a Person Subject to Involuntary Administration of Psychotropic Medication (The People of the State of Illinois, Petitioner-Appellee, v. Beverly B., Respondent-Appellant). |
| District & No. | Second District<br>Docket No. 2-16-0327 |
| Filed | September 28, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 16-MH-66; the Hon. Divya K. Sarang, Judge, presiding. |
| Judgment | Reversed. |
| Counsel on Appeal | Veronique Baker, Teresa L. Berge, Allen W. James, Ann E. Krasuski, and Laurel Whitehouse Spahn, of Guardianship & Advocacy Commission, of Anna, for appellant.<br><br>Joseph H. McMahon, State's Attorney, of St. Charles (Patrick Delfino, Lawrence M. Bauer, and Diane L. Campbell, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE HUTCHINSON delivered the judgment of the court, with opinion.<br>Justices Zenoff and Birkett concurred in the judgment and opinion. |

**OPINION**

¶ 1 Respondent, Beverly B., appeals the order of the circuit court of Kane County granting the State's petition for the involuntary administration of psychotropic medication to respondent, under section 2-107.1 of the Mental Health and Developmental Disabilities Code (Code) (405 ILCS 5/2-107.1 (West 2016)). She contends that the State failed to present sufficient evidence of its compliance with the mandate of section 2-102(a-5) of the Code (405 ILCS 5/2-102(a-5) (West 2016)) that the physician advise her in writing of the alternatives to the proposed treatment. She further contends that there was insufficient evidence that she was exhibiting deterioration of her ability to function or was suffering, as required under section 2-107.1(a-5)(4)(B) of the Code (405 ILCS 5/2-107.1(a-5)(4)(B)(i), (ii) (West 2016)). We reverse. We conclude both that the general information that respondent received about the types of treatments and activities available at the Elgin Mental Health Center (Center) was insufficient to satisfy the section 2-102(a-5) mandate and that the court erred in ruling that respondent was exhibiting deterioration of her ability to function or suffering.

¶ 2                     I. BACKGROUND

¶ 3 Respondent was involuntarily admitted to the Center after her April 9, 2015, adjudication of unfitness to stand trial for aggravated battery of a police officer. On April 8, 2016, the State filed a petition seeking the involuntary administration of psychotropic medication to respondent. The State alleged that respondent was delusional and had received a diagnosis of psychosis not otherwise specified (NOS), that her functioning had declined, that she was suffering as a result of her disorder, and that she had exhibited threatening behavior toward Center staff.

¶ 4 At respondent's first appearance, she told the court that she had experienced negative contacts with public defenders and that she wanted to represent herself. The court, after questioning respondent, permitted her to do so. However, it appointed the public defender to serve as standby counsel.

¶ 5 The State's first witness at the hearing on the petition was Danille Fossie, a social worker at the Center. Fossie said that respondent had granted a friend a power of attorney for health care but had revoked it when the friend exercised it to authorize administration of medication. The public defender attempted to intervene as respondent cross-examined Fossie, and the State successfully objected.

¶ 6 Before the next witness was sworn, the following exchange occurred:

"MS. BLAKE [public defender]: Judge, I'm sorry, [respondent] is going to allow me to represent her, in which case I would ask that Ms. Fossie come back.
***
THE COURT: I'm not going to do that ***. You can start your representation with [the next witness] at this point. I need to question her before I take your word for it, as to [respondent]. All right.

MS. BLAKE: Then, I can't do that, because all the fertile ground and all the problems that I had seen in this case that were issues as to my client's rights not being protected were directly related to Miss Fossie's testimony.

> THE COURT: *** [A]s of right now I have not appointed you back as counsel. You're standby counsel, and [respondent] has not made any request of the Court yet to have her be represented by counsel. So we're going to continue. Unless [respondent] makes a request of the Court, I'm going to honor her request for self-representation under the Constitution. And I'm certainly obliged to do that by case law.
>
> MS. BLAKE: Okay."

Respondent continued to represent herself for the remainder of the hearing.

¶ 7    Dr. Mohammed Ali, respondent's psychiatrist, was the State's second and final witness. He opined that respondent's serious mental illness precluded her from making a reasoned decision about treatment. He also concluded, on the basis of respondent's medical record and his discussions with staff members, that respondent had been delusional for more than a year. He said that he had no way to know exactly when her symptoms had started but that symptoms such as hers would not have begun suddenly. She first had been admitted to the Center in 2014, "on the civil side," and was "discharged from the hospital involving medication." Her most prominent symptom was a belief that some device had been implanted in her brain when she was two years old; she believed that this device helped her monitor drug dealers and communicate with the CIA, FBI, and police. Ali further opined that respondent's ability to function had declined seriously, an opinion he based largely on comparing respondent's current functioning to her previous ability to work as an accountant. Finally, he interpreted several events at the Center as examples of respondent's threatening behavior.

¶ 8    The State questioned Ali about the types of information that he or Center staff had given respondent. It first asked whether respondent had been given written materials about the risks and benefits of the medications that Ali sought to prescribe. Ali said that she had and that those materials were in English. It then asked whether respondent had been offered any other kinds of treatments "less restrictive than medication" and, if so, what they were. Ali said that she had, explaining, "We have daily groups and daily fitness groups, and she is selective in attending those kinds of groups." When the State asked about respondent's access to individual therapy, he said that it was "available" but that respondent had been "selective in participating in those therapies too."

¶ 9    After this series of questions, the court asked the State whether it had asked Ali if respondent "was given in writing the risks and benefits of the less restrictive?" In response, the State asked Ali, "When [respondent] was advised of the less restrictive risks and benefits, were those materials provided to her in writing?" Ali responded, "At the time of her admission, we do give all the group schedule[s], what are the expectation[s], yes." Thus, although the court's question seemed to pertain generally to what information was given, the State asked Ali only whether that information had been in writing, and Ali answered neither question. The State asked Ali whether he had previously testified that respondent did not read the written materials. He indicated that he had been referring only to the written materials about the medications, but he confirmed that the other information was given to respondent on her admission.

¶ 10   Respondent cross-examined Ali, asking him about his sources of information and how much time he had spent talking to her and preparing the petition. She also challenged him on details, such as where she had been when she had allegedly become threatening. She was successful at times in showing that Ali was incorrect about some of these details. The court allowed standby counsel some interjections.

¶ 11    The court adjourned the hearing for about a week. When it resumed, the court again questioned respondent to determine her desire and capacity to represent herself and again allowed her to represent herself with standby counsel available. At this hearing, respondent challenged Ali on his knowledge of the specifics of her case.

¶ 12    Respondent testified on her own behalf. Her remarks showed that she believed that she had an assignment from the "DMV" to track license plates stolen by drug dealers. The State did not cross-examine respondent or present rebuttal evidence.

¶ 13    The State closed by arguing that respondent exhibited each of the factors under section 2-107.1(a-5)(4)(B) of the Code (405 ILCS 5/2-107.1(a-5)(4)(B) (West 2016)) that permit involuntary medication: "(i) deterioration of [the respondent's] ability to function, as compared to [his or her] ability to function prior to the current onset of symptoms of the mental illness *** for which treatment is presently sought, (ii) suffering, or (iii) threatening behavior."

¶ 14    The court ruled that respondent had a serious mental illness, namely psychosis NOS, and was exhibiting deterioration and suffering but not threatening behavior. On the information that respondent had received about other treatments, the court ruled:

> "[T]he doctor testified that other less restrictive services have been explored and been offered to [respondent] for the last year, and they have been found to be inappropriate. Group and individual therapy are not going to make her fully understand the serious mental illness that she suffers from and she does need medication."

It further stated that the "testimony from the doctor also noted that [respondent] has been advised in writing of the risks and side effects of the medication and the risks and side effects of the less restrictive services."

¶ 15    The court advised respondent that she could appeal and that she could be represented by appointed counsel on appeal. Respondent asked standby counsel for assistance with the notice of appeal and asked that the notice include a request for appointed counsel.

¶ 16                                II. ANALYSIS

¶ 17    On appeal, respondent raises three claims of error, all of which she concedes are moot due to the lapse of the 90-day order for treatment; she asks us to address them under the public-interest or capable-of-repetition-yet-evading-review exception to the mootness doctrine. Her claims of error are as follows: (1) the court violated her right to counsel when it declined stand by counsel's request to step in following the direct examination of Fossie, (2) the State failed to present clear and convincing evidence of compliance with section 2-102(a-5) of the Code (405 ILCS 5/2-102(a-5) (West 2016)), which requires that a potential recipient of psychotropic medication be advised in writing of the side effects, risks, and benefits of the treatment, *and* of the alternatives to the proposed treatment, and (3) the State failed to provide sufficient evidence that she had experienced either deterioration in her ability to function or suffering, as required by section 2-107.1(a-5)(4)(B) (405 ILCS 5/2-107.1(a-5)(4)(B)(i), (ii) (West 2016)). The State disputes that any mootness exception applies. It also contests the merits of each of respondent's claims of error. It raises no claim of forfeiture.

## A. Exceptions to the Mootness Doctrine

¶ 19    Because the order at issue here has expired and because we do not generally decide moot questions, we must consider the extent to which respondent's claims fall under any exception to the mootness doctrine before we may address the merits of her claims. See *In re Alfred H.H.*, 233 Ill. 2d 345, 351 (2009). Although we frequently address moot claims in involuntary-medication and other mental-health cases, there is no general mental-health exception to the mootness doctrine. *Id.* at 351-55. Rather, we address such claims under one of the three traditional mootness exceptions: (1) that resolution of the issue is a matter of public interest, (2) that the issue involves a harm capable of repetition yet evades judicial review, and (3) that the respondent could receive indirect relief, as the order from which the appeal was taken has collateral consequences for him or her. *Id.* at 354-63. "The public interest exception allows a court to consider an otherwise moot case when (1) the question presented is of a public nature; (2) there is a need for an authoritative determination for the future guidance of public officers; and (3) there is a likelihood of future recurrence of the question." *Id.* at 355. The evading-review exception has two elements: (1) the contested order must be too short in duration to permit ordinary judicial review and (2) there is a reasonable expectation that the same party will be subject to the same action in the future. *Id.* at 358. Thus, "the resolution of the issue in the present case would be likely to affect a future case involving [the] respondent." *Id.* at 359. Here, we conclude that both of respondent's claims about the merits of the judgment fall under exceptions to the mootness doctrine. However, we also conclude that no exception applies to her claim that the court deprived her of her right to counsel.

¶ 20    We may address respondent's challenges to the circuit court's application of the Code under the public-interest exception. The sections at issue—2-102(a-5) and 2-107.1—must be interpreted in most involuntary-medication proceedings; thus, a court's interpretation of those statutes is a matter of public interest. See *In re Katarzyna G.*, 2013 IL App (2d) 120807, ¶ 9. Furthermore, these issues have not been authoritatively decided in any published court decision. Finally, the questions here, because they relate to important substantive aspects of those sections, will certainly occur in other mental-health cases.

¶ 21    By contrast, the matter of whether respondent was deprived of her right to counsel falls into neither the public-interest nor the evading-review exceptions—and respondent does not suggest that the collateral-consequences exception applies either. Although questions of when standby counsel should take over for respondent might be expected to arise in any future proceedings in which she may be involved, little likelihood exists that any such question would arise with facts similar to those here. Respondent states that "everything hinge[d]" on a peculiar point in the hearing when standby counsel told the court that respondent wanted counsel to take over; the court told counsel that respondent would have to say that herself, and counsel announced that she could not take over unless she were allowed to recall Fossie. Thus, any disposition of this claim would not resolve any particular legal question but would simply apply largely undisputed principles to one incredibly idiosyncratic interaction. These circumstances are unlikely to recur in proceedings involving respondent or anyone else; thus, we are precluded from addressing the matter under either the public-interest or the evading-review exceptions. See *Alfred H.H.*, 233 Ill. 2d at 355, 359.

¶ 22                                    B. Standards of Review

¶ 23        With the matter of mootness resolved, we address the merits of respondent's remaining claims, beginning with the relevant standards of review. Respondent claims a failure to comply with section 2-102(a-5). She also asserts that, as a result of that failure, the State's evidence of her lack of capacity to make a reasoned decision about treatment was insufficient. However, because the evidence relating to compliance with section 2-102(a-5) was largely straightforward and undisputed, the question involves the application of law to essentially undisputed facts, and thus is a question of law, subject to *de novo* review. See *In re Laura H.*, 404 Ill. App. 3d 286, 290 (2010) (review of whether there has been compliance with section 2-102(a-5) is *de novo*). We recognize that the parties dispute what information respondent received. However, as we will discuss, the record entirely resolves that dispute; any conflict in the evidence is illusory. Likewise, although respondent's claim that the State failed to prove that she exhibited deterioration of her ability to function or suffering is a challenge to the sufficiency of the evidence, her claim turns on the interpretation of section 2-107.1. This, too, is a question of law. See *Moon v. Rhode*, 2016 IL 119572, ¶ 22 (interpretation of a statute is a question of law, so review is *de novo*).

¶ 24                    C. Compliance With the Section 2-102(a-5) Mandate for
                    Information Concerning Alternatives to the Proposed Treatment

¶ 25        Respondent claims that she did not receive information that satisfied section 2-102(a-5). That section requires that, when seeking to administer psychotropic medication, "the physician or the physician's designee [must] advise the recipient, in writing, of the side effects, risks, and benefits of the treatment, as well as alternatives to the proposed treatment, to the extent such advice is consistent with the recipient's ability to understand the information communicated." 405 ILCS 5/2-102(a-5) (West 2016). Respondent argues that the information that Ali said she received was merely a general description of programs available at the Center and that no evidence showed that she received information explaining how those programs could serve as alternatives to the proposed medication. The State responds that the information was sufficient because "respondent was offered other, less restrictive methods of treatment than psychotropic medication—*** daily groups and daily fitness groups, as well as individual therapy with a social worker, a psychologist, and with Dr. Ali." Thus, respondent's position is that under section 2-102(a-5) she was supposed to receive information about treatments that were specific alternatives to the proposed medication, whereas the State's position is that the section is satisfied by general information about other treatments.

¶ 26        It is error for a court to grant a petition for the involuntary administration of psychotropic medication absent evidence of compliance with section 2-102(a-5). "The rationale underlying the requirements of section 2-102(a-5) is to not only ensure that a respondent is fully informed, but also 'to ensure that a respondent's due process rights are met and protected.' " *In re Nicholas L.*, 407 Ill. App. 3d 1061, 1072 (2011) (quoting *In re John R.*, 339 Ill. App. 3d 778, 784 (2003)). Therefore, strict compliance with the section is "necessary to guard a respondent's fundamental liberty interest in refusing invasive medication." *Nicholas L.*, 407 Ill. App. 3d at 1072. Moreover, for a court to properly grant such a petition, it must find that the respondent lacks the capacity to make a reasoned decision to accept or refuse psychotropic medication. 405 ILCS 5/2-107.1(a-5) (West 2016). However, Illinois law does not allow a court to make that finding unless the State has presented evidence that the respondent received

- 6 -

information sufficient to form the basis for a reasoned decision. To be able to make such a decision, the respondent needs to know whether any reasonable alternatives to psychotropic medication exist. "[A]dequate proof that a respondent has been provided with all of the information necessary to make a reasoned decision is crucial to a determination concerning the respondent's capacity to make such a decision." *In re Debra B.*, 2016 IL App (5th) 130573, ¶ 27. Here, we conclude that the proof is inadequate to show that respondent received such information.

¶ 27    Before addressing the core of respondent's claim—which is a question of law—we resolve one issue of fact. The State argues that the evidence supports the circuit court's finding that "[t]he testimony from [Ali] *** [was that respondent] has been advised in writing of *** the risks and side effects of the less restrictive services." But the court's finding was contrary to the evidence. Ali said that respondent had received information about the risks and benefits of the proposed medications. However, the only evidence relating to alternative treatments is Ali's testimony that, "[a]t the time of her admission, we do give all the group schedule[s], what are the expectation[s]."

¶ 28    We now address why the information respondent received—general information about the treatments available at the Center—did not satisfy section 2-102(a-5). Proper interpretation of section 2-102(a-5)'s mandate requires an understanding of that section's place in the Code. Three sections, section 2-102(a-5), section 2-107 (405 ILCS 5/2-107 (West 2016)), and section 2-107.1, have a primary role in governing the administration of psychotropic medication under the Code.

¶ 29    First, section 2-102(a-5) permits voluntary administration of such medication, when the "recipient has the capacity to make a reasoned decision about the treatment." 405 ILCS 5/2-102(a-5) (West 2016). (It also allows substituted consent, such as by the holder of a power of attorney for health care. Respondent revoked the holder's power of attorney when the holder used it to consent to medication, so, from here on, for the sake of simplicity, we do not discuss substituted consent. We simply note that the Code allows such consent in many circumstances.)

¶ 30    Second, section 2-107 partly parallels section 2-102(a-5)—with an emphasis on the procedure surrounding refusal of treatment—and provides for emergency treatment while setting limits on the type and length of such treatment. In particular, section 2-107(a) (405 ILCS 5/2-107(a) (West 2016)) requires an adult recipient to be informed that he or she may refuse medication or electroconvulsive therapy. If the recipient refuses the treatment, the facility must inform him or her of "alternate services available and the risks of such alternate services, as well as the possible consequences to the recipient of refusal of such services." 405 ILCS 5/2-107(a) (West 2016). Further, a refusal can be overridden—without resort to a petition for involuntary treatment—only if the "services are necessary to prevent the recipient from causing serious and imminent physical harm to the recipient or others and no less restrictive alternative is available." 405 ILCS 5/2-107(a) (West 2016). When the circuit court here found that "[t]he testimony from [Ali] *** [was that respondent] has been advised in writing of *** the risks and side effects of the less restrictive services," it echoed the requirements of section 2-107. We point out that nothing in section 2-107 is specifically dependent on a recipient's capacity or lack of capacity to consent to treatment.

¶ 31    Third, section 2-107.1 provides for court-approved administration of psychotropic medication: "Notwithstanding the provisions of Section 2-107 of this Code, psychotropic

medication *** may be administered to an adult recipient of services *** without the informed consent of the recipient" under the standards at issue in this appeal. 405 ILCS 5/2-107.1(a-5) (West 2016). It permits such administration only if, among other things, "the recipient has a serious mental illness" (405 ILCS 5/2-107.1(a-5)(4)(A) (West 2016)) and "the recipient lacks the capacity to make a reasoned decision about the treatment" (405 ILCS 5/2-107.1(a-5)(4)(E) (West 2016)). Section 2-107.1 thus forms a complement to section 2-102(a-5), which provides that a recipient with capacity can give effective consent to treatment. We note that, given this complementarity, section 2-107.1's reference to treatment without informed consent suggests that section 2-102(a-5) refers to treatment *with* informed consent or something approximating it.

¶ 32     This discussion shows that sections 2-102(a-5) and 2-107.1 are linked by their dependency on a determination of a recipient's capacity to consent to treatment. The particular test we use for that capacity links them even more closely. We say that an individual has the capacity to consent to (or refuse) the administration of psychotropic medication when, "based upon conveyed information concerning the risks and benefits of the proposed treatment and reasonable alternatives to treatment, he [or she] makes a rational choice to either accept or refuse the treatment." *In re Israel*, 278 Ill. App. 3d 24, 36 (1996). Compare this phrasing with section 2-102(a-5)'s mandate to "advise the recipient, in writing, of the side effects, risks, and benefits of the treatment, as well as alternatives to the proposed treatment." 405 ILCS 5/2-102(a-5) (West 2016). These requirements are functionally all but identical. This explains why we treat section 2-102(a-5)'s mandate as a *sine qua non* for determining an individual's capacity to consent to treatment. See *Debra B.*, 2016 IL App (5th) 130573, ¶ 27; *Katarzyna G.*, 2013 IL App (2d) 120807, ¶ 17 (both reasoning that, if a respondent has not been given the information required by section 2-102(a-5), any proof of the respondent's lack of capacity is necessarily inadequate). Keeping this in mind, and recalling that the introduction to section 2-107.1 implies that section 2-102(a-5) requires something in the nature of informed consent, it becomes clear that information sufficient to comply with section 2-102(a-5) is simply such information as would be needed to support a reasoned decision about treatment.

¶ 33     Recognizing this, we have a standard by which we can decide whether the information respondent received was adequate. To make a reasoned decision, an individual should have a general idea of the advantages and disadvantages of his or her realistic choices. General information about mental-health treatments that might or might not be of use to a recipient does not help a recipient understand his or her choices. Indeed, information about treatments of no value to the recipient will be only a source of confusion and so reduce the chance of a reasoned decision. Moreover, the relevance of the information needs to be apparent. That is, merely advising a recipient that a treatment exists without advising him or her of how it is relevant is not likely to help.

¶ 34     The information respondent received about alternatives to psychotropic medication does not meet this standard. According to the testimony, when she was admitted, she, like everyone who is admitted, apparently received group schedules and a statement of expectations or rules. However, there is no evidence that, when psychotropic medication was proposed, respondent received an explanation of how any treatment referred to in the schedules was an alternative to the medication. Nor is there evidence that, when she received the schedules, she was told that she would need to refer to them later if medication were proposed. More critically, no

- 8 -

suggestion exists in the evidence that the schedules usefully informed respondent what treatments were plausible alternatives for her.

¶ 35 The State argues that section 2-102(a-5) was satisfied in that "respondent was offered other, less restrictive methods of treatment than psychotropic medication—*** daily groups and daily fitness groups, as well as individual therapy with a social worker, a psychologist, and with Dr. Ali." We are unpersuaded. The State implies that section 2-102(a-5)'s purpose is to protect a recipient's access to "less restrictive methods of treatment." Other sections of the Code serve that purpose. Section 2-102(a) of the Code (405 ILCS 5/2-102(a) (West 2016)) requires that a recipient receive services "in the least restrictive environment." Section 2-107.1(a-5)(4)(F) (405 ILCS 5/2-107.1(a-5)(4)(F) (West 2016)) requires proof "[t]hat other less restrictive services have been explored and found inappropriate" before a court may order involuntary administration of psychotropic medication. Section 2-102(a-5) has a different role; it requires a facility to give a recipient the chance to make an informed and reasoned decision before it seeks involuntary administration. To be clear, the sections are linked. In particular, if the recipient receives information and then makes a decision to accept medication, the result is clearly less restrictive than forced medication. This is so even if it turns out that the recipient lacks the capacity to make a reasoned decision and that substituted consent of some kind is still necessary—that situation still avoids force. In other words, unless there has been an attempt to get the recipient to agree to medication, there generally cannot be proof that less restrictive services have been explored and found inappropriate.

¶ 36 The State implies that, because respondent was *offered* "less restrictive" treatments, she must have received the information required by section 2-102(a-5). We do not agree with this argument either. We can infer from the length of respondent's stay alone that she had opportunities to observe and was aware of some of the other kinds of treatments available at the Center. That does *not* mean that she had any idea whether, for instance, those treatments had proven ineffective and thus lacked relevance to her, or whether they still served a purpose. No evidence suggests that anyone informed respondent of the relevance of her past treatment experience to deciding whether to agree to psychotropic medication. We therefore reject the idea that she received the kind of information that would be necessary to support a reasoned decision.

¶ 37 The State argues in the alternative that, even if the information did not satisfy section 2-102(a-5), the error was harmless in that "the legislative purpose of the statute was achieved and reversal should not be required." We have already explained our disagreement with the State's view of section 2-102(a-5)'s purpose. The State did not show that respondent received sufficient information to allow her to make a reasoned decision, which is what was necessary to achieve the legislature's purpose. We thus do not deem the error harmless.

¶ 38                    D. Sufficiency of the Evidence of Respondent's Deterioration or Suffering

¶ 39 Finally, we hold that the court erred in finding that respondent was subject to the involuntary administration of psychotropic medication based on her exhibiting deterioration in her ability to function and suffering. We conclude that, regardless of the persuasiveness of the evidence of deterioration and suffering, the evidence linking that deterioration and suffering to respondent's mental illness was insufficient. A court may grant an order for the involuntary administration of psychotropic medication "if and only if it has been determined by clear and convincing evidence" that "the recipient has a serious mental illness or developmental

disability" (405 ILCS 5/2-107.1(a-5)(4)(A) (West 2016)) *and* that, "because of said mental illness or developmental disability, the recipient currently exhibits any one of the following: (i) deterioration of his or her ability to function, as compared to the recipient's ability to function prior to the current onset of symptoms of the mental illness or disability for which treatment is presently sought, (ii) suffering, or (iii) threatening behavior" (405 ILCS 5/2-107.1(a-5)(4)(B) (West 2016)). In *Debra B.*, 2016 IL App (5th) 130573, ¶ 47, the court suggested that the legislature did not intend that a recipient be subject to involuntary medication based on problems that the medication could not possibly treat. We agree that the requirements of section 2-107.1(a-5)(4)(B) make sense only on the assumption that the medication specifically addresses the deterioration, suffering, or threatening behavior.

¶ 40 This conclusion is part of what prevents section 2-107.1(a-5)(4)(B) from being impermissibly vague. The supreme court in *In re C.E.*, 161 Ill. 2d 200, 228 (1994), tells us that the terms "deterioration," "suffering," and "threatening *** behavior" in section 2-107.1(a-5)(4)(B) avoid constitutionally impermissible vagueness because courts can and must interpret them "in the context of the mental illness *** from which the mental health recipient is suffering and for which the psychotropic medication has been suggested." If "suffering" could be distaste for being confined to a mental-health facility, or if "deterioration" could be the financial and social consequences of such confinement, then those terms would have nothing to do with the mental illness that the medication was proposed to treat. Thus, in *Debra B.*, where evidence showed that the respondent was suffering because she was concerned about the management of her home and missed her pets, the court held that this was not a basis for involuntary medication, as "[t]his [was] not the type of 'suffering' that [could] be alleviated by psychotropic medication." *Debra B.*, 2016 IL App (5th) 130573, ¶ 47. Here too, the State failed to show that the medication would alleviate respondent's deterioration or suffering.

¶ 41 The direct evidence of the effect of respondent's illness on her functioning was weak. We do know that respondent's delusions on a single occasion brought her into conflict with the Batavia police. However, although Fossie in particular seemed to imply that respondent's illness had cost respondent her job and her family relationships, the record does not tell us whether it did so directly or through the cascading effects of that single encounter. Similarly, even assuming adequate evidence of respondent's homelessness, that evidence would still fail to show deterioration in respondent's functioning, as the loss of her home might have been a further consequence of her arrest and subsequent job loss.

¶ 42 The State concedes that nothing in the evidence shows a direct link between respondent's losses and her illness, but it suggests that this is of no consequence. Indeed, it goes so far as to argue that, given the length of respondent's incarceration and commitment, we can reasonably infer that respondent is homeless and unemployed and thus has experienced a deterioration in her functioning. We reject the State's reasoning out of hand; the legislature cannot have intended that we countenance the involuntary medication of respondent on the basis of economic harm from her incarceration and commitment.

¶ 43 The evidence that respondent was suffering was similarly insufficiently linked to her illness; the court relied only on respondent's unhappiness with her commitment. The parties agree that, in this context, "suffering" means "experiencing distress or anguish"; it is thus not here a synonym for "experiencing a specific condition." Thus, to show suffering, the State must do more than meet the section 2-107.1(a-5)(4)(A) (405 ILCS 5/2-107.1(a-5)(4)(A) (West

- 10 -

2016)) requirement to show that "the recipient has a serious mental illness." See *Debra B.*, 2016 IL App (5th) 130573, ¶¶ 38-46 (evidence that the respondent had symptoms of a serious mental illness was not sufficient to show that she was suffering). Here, as in *Debra B.*, the State showed that respondent was experiencing the symptoms of a serious mental illness and that she was experiencing distress at her circumstances, but it failed to show that the proposed medication could treat that distress. More specifically, the State showed that respondent was experiencing delusions, but it failed to present evidence "provid[ing] any insight into why *** these symptoms caused *** suffer[ing]." *Debra B.*, 2016 IL App (5th) 130573, ¶ 45.

¶ 44    The evidence here showed predominately that respondent's suffering was the result of her dislike of her confinement. Ali testified as much:

> "Q. [Assistant State's Attorney:] *** Does it upset [respondent] to be here?
>
> A. Yes.
>
> Q. Okay. Do you ever observe her appearing to be sad?
>
> A. Yes. On occasion when I was trying to talk to her about treatment plan, she was not happy."

Further, the court found that respondent was suffering, but it discussed her distress largely in terms of her desire to leave the Center. That said, we note the evidence of unpleasant-sounding delusions. In particular, there was evidence that respondent had reported that Center staff members had been replaced by their twins. However, the evidence does not show how respondent reacted to those delusions. Thus, although one could infer that those delusions were distressing, the inference is not clear and convincing.

¶ 45    Before concluding, we take a moment to, again, point out that the forcible administration of antipsychotic medication into a nonconsenting person's body is a significant intrusion on that person's liberty. See *Washington v. Harper*, 494 U.S. 210, 229 (1990). Antipsychotic drugs "alter the chemical balance in a patient's brain, leading to changes, intended to be beneficial, in his or her cognitive processes." *Id.* But they also can have "serious, even fatal, side effects." *Id.* In addition, the involuntary administration of antipsychotic drugs necessarily alters a person's brain functioning against his or her will—and this intrusion "could engender fear that the government was trying to brainwash its citizens." *Johnson v. Tinwalla*, 855 F.3d 747, 749 (7th Cir. 2017). These fundamental liberty interests, therefore, can give way *only* if the State can establish *both* the need for mental-health treatment *and* compliance with the Code's procedural safeguards. Here, the State's evidence did not clear those hurdles. The State failed to show that respondent required *forcible* treatment; and the State failed to show that respondent had received sufficient information to enable her to make a reasoned decision regarding her treatment.

¶ 46                                III. CONCLUSION

¶ 47    For the reasons stated, we reverse the judgment of the circuit court of Kane County.

¶ 48    Reversed.