# Illinois Official Reports

## Appellate Court

---

**In re Rob W., 2021 IL App (1st) 200149**

---

| | |
|---|---|
| Appellate Court Caption | *In re* ROB W., a Person Found Subject to Involuntary Medication (The People of the State of Illinois, Petitioner-Appellee, v. Rob W., Respondent-Appellant). |
| District & No. | First District, First Division<br>Nos. 1-20-0149, 1-20-0551 cons. |
| Filed<br>Modified upon<br>denial of rehearing | October 25, 2021<br><br>February 7, 2022 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 19-COMH-2915, 19-COMH-4517; the Hon. Nichole C. Patton and the Hon. Maureen O. Hannon, Judges, presiding. |
| Judgment | Affirmed in part and reversed in part. |
| Counsel on Appeal | Veronique Baker, Laurel Spahn, Ann Krasuski, and Matthew R. Davison, of Illinois Guardianship and Advocacy Commission, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Brenda K. Gibbs, Assistant State's Attorneys, of counsel), for the People. |

Panel

JUSTICE PUCINSKI delivered the judgment of the court, with opinion.
Presiding Justice Hyman and Justice Walker concurred in the judgment and opinion.

## OPINION

¶ 1    In these consolidated appeals, respondent-appellant Rob W. appeals from the circuit court's September 2019 order authorizing involuntary administration of medication for 90 days, as well as a separate order on December 23, 2019, authorizing involuntary administration of medication for 180 days. For the following reasons, we affirm the September 2019 order. However, we reverse the December 2019 order, as we agree that the imposition of a 180-day order was a violation of his due process rights when the corresponding petition requested authorization for up to 90 days and the State did not present evidence to support the need for medication beyond 90 days.

¶ 2                                      BACKGROUND

¶ 3    The record reflects that Rob has a history of psychiatric illness, including schizophrenia. He was admitted to the University of Illinois-Chicago Hospital (UIC) on March 17, 2019, due to "psychotic symptoms," including an incident in which he allegedly stabbed his brother, Paul.

¶ 4    In May 2019, Rob was admitted to the Madden Mental Health Center (Madden), where he was treated by Dr. Stuart Rich for the next several months. On August 9, 2019, Dr. Rich filed a petition in the circuit court requesting an order authorizing involuntary administration of psychotropic medication to Rob pursuant to section 2-107.1 of the Mental Health and Developmental Disabilities Code (Code) (405 ILCS 5/2-107.1 (West 2018)). In the petition, Dr. Rich alleged that Rob exhibited threatening behavior, stating: "[Rob] has a long history of violent behavior resulting from his psychotic illness. Most recently, he stabbed his brother in March 2019 because of persecutory delusions." The petition requested authorization to administer a number of psychotropic medications "for up to ninety (90) days."

¶ 5    On August 27, 2019, Rob's counsel filed a motion to withdraw, indicating that Rob had expressed his desire to represent himself. At a hearing on September 5, 2019, the court first addressed the motion to withdraw and questioned Rob regarding his understanding of the proceedings and the role of appointed counsel. In response to the court's questions, Rob claimed that he was a lawyer and that he had studied law at "Park Forest" "in the library." Rob then stated that he did not go to college. When the court asked Rob if he understood what would be the "worse case scenario out of today's hearing," he answered negatively. The court then denied counsel's motion to withdraw and proceeded directly to an evidentiary hearing.

¶ 6    Dr. Rich testified that he had been Rob's treating psychiatrist at Madden since Rob's admission on May 31, 2019. Rob had been transferred to Madden from UIC, where he was admitted in March "because of psychotic symptoms that resulted in his stabbing his brother." Dr. Rich testified that Rob was initially "admitted [to Madden] on a voluntary basis and then signed a request for discharge," after which "we then submitted a petition and certificates for involuntary admission."

¶ 7 Dr. Rich testified that he observed Rob on a daily basis, reviewed his medical records, and received information about Rob's mental health history from Rob's brother, Paul. Paul reported to Dr. Rich that Rob had "a psychotic illness for approximately 10 or 15 years" but had generally "not cooperated with treatment." Paul informed Dr. Rich that Rob had been "deteriorating over the last several months leading up to his admission," had become increasingly violent, and had "assaulted multiple people" on separate occasions, including attacking Paul with a knife.

¶ 8 Dr. Rich testified that Rob's family obtained a "writ of detention," after which Rob was admitted to UIC and a court order for involuntary medication was obtained.[1] Dr. Rich testified that, after Rob was transferred to Madden, Dr. Rich continued to medicate Rob based on the order that was granted while he was at UIC.

¶ 9 Dr. Rich testified to his opinion that Rob suffered from a serious mental illness, schizophrenia, and agreed that he was "currently symptomatic." Asked to describe Rob's symptoms, Dr. Rich testified:

> "He becomes disorganized, his thought processes, gives answers to some questions that don't make sense, other times he makes sense. He has delusions that at various times asserted that he was a psychiatrist or lawyer ***. He has delusions about his family. He described his mother as having died multiple times and come back to life. He described his brother as an arsonist and a hologram and also asserted that he had killed his brother multiple times."

Dr. Rich related that Rob believed he was "persecuted" by his brother, whom he accused of burning down the family farm where they both lived. Dr. Rich also testified that it was reported that Rob "had been pulling out his teeth prior to his admission from UIC because he believed that a dentist had implanted tracking devices in them."

¶ 10 Dr. Rich further testified that, since Rob's admission, he was "for the most part well[-]behaved" and was "irritable at times, but has not been aggressive toward anyone." He described Rob as "polite and courteous" but in the past few weeks Rob had been "increasingly withdrawn" and "isolative." Rob indicated to Dr. Rich that he did not believe he suffered from mental illness and did not believe he needed medication.

¶ 11 Dr. Rich testified to his opinion that Rob "exhibits threatening behavior." Asked for the specific facts that led to this opinion, Dr. Rich cited: "The report of his brother that he stabbed him and that he had assaulted multiple people with a pipe, an axe, and that he also headbutted his 79 year old stepfather." Dr. Rich answered negatively when asked if Rob had exhibited any threatening behavior in the hospital, but he answered affirmatively when asked if he still believed that Rob had a "propensity to exhibit threatening behavior." Dr. Rich then opined that Rob had not shown threatening behavior in the hospital because he was in a "controlled environment" and because he had been treated with "long-acting medication, which is still very much in his system."

¶ 12 Dr. Rich confirmed that he was seeking authorization of involuntary medication "for up to 90 days." He specified that he sought daily administration of risperidone as a primary medication, for a "decrease in psychotic symptoms and, therefore, a decrease in aggressive behavior." He also sought to treat Rob with a number of secondary psychiatric medications.

---

[1]The record on appeal does not include a copy of the court order authorizing medication for Rob while he was admitted at UIC.

Dr. Rich testified that he did not believe Rob had capacity to make a reasoned judgment about treatment with medication.

¶ 13    On cross-examination, Dr. Rich testified that when he first met with Rob on June 3, Rob stated he had killed his brother. Following cross-examination, the court asked Dr. Rich if he had discussed with Rob "any aggressive behavior with his brother or with his stepfather." Dr. Rich answered that Rob had denied stabbing his brother or headbutting his father but "on other occasions he had said that he had killed them."

¶ 14    Paul testified that Rob is his brother, and that Rob was 56 years old. Before Rob's hospitalization in March 2019, Rob had lived for many years in a coach house that was located on the same property as Paul's home.

¶ 15    Paul testified that Rob suffered from mental illness all his life and that he had two prior psychiatric hospitalizations within the past 10 years. In approximately 2013, Rob was hospitalized for three to six months. That hospitalization was prompted by Rob "acting violent" and "uncooperative" and refusing to socialize with his family. Rob improved somewhat after the first hospitalization.

¶ 16    Paul recalled the second hospitalization occurred "four to five years ago," which was prompted by Rob getting "increasingly more confrontational," including an incident where Rob attacked Paul and a friend. Paul recalled that Rob had "grabbed a pipe that was about eight feet long and he ran at me and my friend like it was a spear." Paul testified that in another incident, Rob headbutted his father when he tried to talk to him about cleaning his apartment and "how he was treating my mother."[2]

¶ 17    Paul recalled that Rob's most recent hospitalization was prompted by Rob "react[ing] violently" when Paul, his girlfriend, and his father tried to speak to Rob about "getting him some help and cleaning up his apartment." Paul recalled that his father was trying to tell Rob to clean his apartment and that "we also did not want any knives over there anymore," because they "didn't trust that he wouldn't do something violent with them." Paul stated that Rob unfolded a pocket knife as he approached the door, and waved it as he told his family members to leave. Paul recalled that Rob "chased me out into the yard with the knife and was able to stab me in my chest with it through my coat." Paul said he was injured, but the injury was not serious.

¶ 18    After the stabbing, Paul, his girlfriend and his father locked themselves in Rob's apartment while Rob was outside. Rob was "walking around looking in the windows and yelling at us." Rob eventually retrieved an axe and began chopping at the doorframe "six or seven times" before he went to a garage door and began striking it with the axe.

¶ 19    Paul's girlfriend and father went out the back door, and Rob threatened them with the axe. Paul approached Rob from behind and was able to take the axe away from Rob after a struggle. After this incident, Paul went to the state's attorney's office and testified before a judge to get an emergency order, after which Rob was taken to UIC.

¶ 20    On cross-examination, Paul acknowledged that he had last seen Rob in late February or early March 2019 and had not spoken to him by phone since he was hospitalized. Paul

---

[2]The record indicates that the person referred to by Paul as his father is the same person referred to by Dr. Rich as Rob's stepfather, although the record does not include the name of that individual.

acknowledged that Rob had a history of alcoholism, but he did not know if Rob was intoxicated when Rob stabbed him.

¶ 21 At the conclusion of the hearing, the court granted the petition, finding that Dr. Rich and Paul were credible. The court noted Dr. Rich's testimony that Rob is "delusional and has disorganized thoughts, and he has told the Doctor that he killed his brother." The court found that Paul "credibly testified regarding the threatening and violent action by [Rob] when he was not on medication prior to his admission into the hospital." The court found that the State had proven by clear and convincing evidence that Rob has schizophrenia and that he lacked capacity to consent to the medication treatment.

¶ 22 Following the hearing, on September 5, 2019, the court entered an order in which it found that Rob "currently exhibits" "threatening behavior." The order specified that it would be in effect for a period not to exceed 90 days.

¶ 23 Rob filed a motion to reconsider. Rob argued that the State's evidence failed to show that he "currently exhibits" threatening behavior, as that phrase is used in section 2-107.1 of the Code, insofar as the threatening behavior described "occurred at last 6 months before" the hearing.

¶ 24 On December 3, 2019—while the motion to reconsider the September 2019 order was still pending—Dr. Rich filed another petition to authorize involuntary medication pursuant to section 2-1071 of the Code (the December 2019 petition). The factual allegations of the December 2019 petition were largely similar to that of the August 2019 petition, reciting that Rob was admitted to UIC in March 2019 "because of psychotic symptoms that included delusions, disorganized speech and violent behavior (he stabbed his brother with a knife two weeks prior to admission because of persecutory delusions)" and that he "stated that his brother is a hologram, that he has killed him before and will do so again." The December 2019 petition further alleged that Rob "has been receiving antipsychotic medication under a court order since 9.6.19 with some improvement in his mental state, but he continues to have delusions and poor insight."

¶ 25 As in the August 2019 petition, the December 2019 petition alleged that Rob exhibited "threatening behavior" because he has a "long history of violent behavior resulting from his psychotic illness. Most recently, he stabbed his brother in March 2019 because of persecutory delusions." In the December 2019 petition, Dr. Rich sought authorization for administration of psychotropic medication "for up to ninety (90) days," specifying the primary medication as haloperidol decanoate.

¶ 26 Rob moved for substitution of judge as of right, which was granted. Thus, whereas Honorable Maureen Hannon presided over the September 2019 proceedings, Honorable Nichole Patton presided over the December 2019 proceedings.

¶ 27 The court conducted an evidentiary hearing on December 23, 2019. At that time, the court admitted into evidence Dr. Rich's August 2019 petition, the entire transcript of the September 5, 2019, hearing, and the September 5, 2019, medication order.

¶ 28 Dr. Rich, the only witness, proceeded to testify as an expert witness. Similar to his testimony at the September 2019 hearing, Dr. Rich testified that he learned from UIC records, as well as conversations with Rob and Paul, about the incident when Rob stabbed Paul. Rob had told Dr. Rich that the incident happened after his brother was "breaking and entering" into Rob's residence.

¶ 29    Dr. Rich testified that, following the September 5, 2019, order, Rob had been on court-ordered medication from September 15 to December 4, 2019, when the order expired. Dr. Rich testified that he examined Rob "each weekday" and observed his behavior.

¶ 30    Dr. Rich testified to his opinion that Ron had schizophrenia and was "currently symptomatic." Dr. Rich testified that Rob had "negative symptoms in that he has blunted affect and is socially withdrawn and does not engage in a lot of goal-directed behavior" and had poor hygiene. Dr. Rich also described "positive symptoms":

> "[H]e has both thought disorder and delusions, and there are indications that he's had hallucinations in the past, although I have not personally observed current evidence of that, but delusions include that *** he recently told me that he is a lawyer, that he owns the family farm, that that happened because he bought it for his stepfather because he is a lawyer and has hundreds of millions of dollars. He also has stated apparently recently that his brother is a schizophrenic with an IQ of 72 and controls other people through video games and has multiple personalities."

Furthermore, Rob was sometimes "disorganized in his speech and thinking," gives "answers to questions that don't make any sense," and exhibits "derailment, which is sudden shifts in a topic one after another." Rob showed such symptoms on a daily basis. Dr. Rich further testified that Rob "never wavered" from his position that he had no mental illness.

¶ 31    Dr. Rich also testified to his opinion that Rob "exhibits threatening behavior." Asked what specific facts led him to that conclusion, Dr. Rich answered: "That he was violent towards his family in the past. In addition to stabbing his brother, he head head-butted [sic] his elderly stepfather on one occasion, and on another occasion attempted to attack his brother and a friend of his brother's with a pipe. He continues to have delusions about his brother and about the family property and his right to it." Dr. Rich testified that Rob's delusions that he owned the property and his brother was "squatting" on it "led to his becoming violent towards his brother in the past." Dr. Rich testified that Rob had been symptomatic throughout his entire stay at Madden.

¶ 32    Dr. Rich answered negatively when asked if Rob had exhibited any threatening behavior since he was admitted to Madden on May 31, 2019, leading to the following exchange:

> "Q. Now, how can you tell this Court that he's exhibiting threatening behavior when he hasn't exhibited any specific incidents of that type of behavior since his admission?
>
> A. Because his violent and threatening behavior in the past has not been directed towards just anyone. It's always been directed to particular people, family members; and the ideas that were the basis of that behavior are still present. He's not seen any of his family since he's been in the hospital."

Dr. Rich further testified that Rob had been on medication during his admission and was in a "structured environment which would tend to decrease that kind of behavior."

¶ 33    The State asked Dr. Rich: "And are you seeing another commitment—another treatment order for up to 90 days?" Dr. Rich answered: "Yes."

¶ 34    Dr. Rich then described the benefits and side effects of the medication he wished to administer. He testified that the primary medication, haloperidol decanoate, "would decrease delusions, thought disorder and agitation and therefore, presumably violent behavior as well."

He agreed that, without medication, Rob could "potentially engage in threatening behavior towards his family."

¶ 35   On cross-examination, Dr. Rich agreed that Rob had not exhibited any threatening behavior in the approximately 200 days he had been admitted at Madden, including the approximately three months since Dr. Rich's prior petition was granted in September 2019. He agreed that the incident where Rob attacked his brother was in March 2019 and that the incidents involving headbutting his father and attacking his brother with a pipe were in 2018. Dr. Rich agreed that there were no new instances of Rob showing threatening behavior since the prior petition was filed.

¶ 36   On redirect examination, Dr. Rich agreed when asked if Rob's threatening behavior was a "persistent condition." He explained "the risk of that behavior remains elevated because the ingredients for that behavior appear to be not being on medication and being in proximity of his family, in particular, his brother." He opined that, if Rob was discharged without medication, he would return to the family property and "would be a high risk for violence."

¶ 37   Rashad Kilbert testified that she is a social worker at Madden and that Rob was her client since late May 2019. She recalled a conversation with Rob on October 15, 2019, in which Rob said he attempted to stab his brother, but "it didn't go through his skin." After Kilbert reviewed her progress note from that date, she testified that Rob said his brother "controls people through video games and that his brother is an arsonist." Rob "started to laugh" when he was told that his stepfather was deceased. After she reviewed a note from November 20, 2019, Kilbert testified that Rob stated on that date that his brother "had a mental illness."

¶ 38   Kilbert testified that Rob's medication was changed in late November 2019, although she did not know the name of the new medicine. After that time, he became more cooperative and had indicated a willingness to talk to his brother.

¶ 39   In closing argument, Rob's counsel emphasized that "there's been no aggressive behavior since his admission to Madden in May 2019." Counsel asserted that the most recent aggressive event was "at least over nine months ago, and the code in [section 2-107.1] says the respondent currently demonstrates, and this Court is called upon not to render any of that language superfluous." Rob's counsel argued that the December 2019 petition was "basically the same petition" as the August 2019 petition and there was no evidence "of any type of threatening behavior."

¶ 40   Following argument, the court found the State established by clear and convincing evidence that Rob was subject to administration of medication due to his schizophrenia. The court then stated that it would "make a finding of threatening behavior," explaining:

   "I think what's important in this particular case is that the Doctor noted that [Rob's] threatening behavior is not where he becomes violent with anyone. Even whether reviewing the prior transcript, his threatening behavior is based on his fixed false delusions, that his brother is a squatter, that he owns the property, that his brother is schizophrenic, that his brother has multiple personalities, that his brother is controlling people through video games. It's all about his brother. And not only does he have this fixed false delusion about his brother, he's actually acted out on this delusion where he has chased his brother with a pipe, attempting to attack him with a pipe. He has stabbed his brother. The violence was also towards his stepfather where he was deceased, where he had head butted; and I believe his stepfather at the time was 80 years old.

That the challenge the Doctor is having with [Rob] is that he still has these false delusions. Although he's been here since May and he's been [on] medication, he is still under the belief that he owns the property and that his brother is pretty much a trespasser in that he—his brother is an arsonist; and, once again, he's controlling people through video games and that he has not changed from that fixed false delusion of his brother, which is a concern of the Doctor."

¶ 41    The court proceeded to remark that "[i]t has come to this Court's attention that this is [Rob's] third Court order" authorizing involuntary administration of medication, with the "[f]irst court order being at UIC" and the second being the September 5, 2019, order. The court noted that section 2-107.1(a-5)(5) of the Code allows for orders of up to 90 days' duration for the first and second orders, and that thereafter, "additional 180-day periods of involuntary treatment may be authorized to the standards and procedures of this Section without limit." 405 ILCS 5/2-107.1(a-5)(5) (West 2018). The court then stated: "Therefore, it is the order of this Court that this order shall be in effect not to exceed 180 days."

¶ 42    Rob's counsel immediately noted its objection to the 180-day time period, pointing out that "at no point were we told the petitioner in this matter *** was seeking treatment in excess of 90 days" and there was "no notice of that to tell our client." Rob's counsel asked to stay the court's order pending an appeal, but the court denied that request.

¶ 43    Accordingly, the court entered a written order on December 23, 2019, specifying the court's findings that Rob "currently exhibits" "threatening behavior." The order authorized involuntary administration of haloperidol decanoate and a number of secondary medications, and it stated that it was in effect for a period not to exceed 180 days.

¶ 44    On January 22, 2020, Rob filed a notice of appeal (appeal No. 1-20-0149) from the December 23, 2019, order authorizing involuntary medication for up to 180 days.

¶ 45    Rob's motion to reconsider the September 5, 2019, order authorizing 90 days of involuntary medication remained pending during the proceedings that led to the December 2019 order. Following a hearing on February 26, 2020, the trial court denied Rob's motion to vacate the September 2019 order. On March 20, 2020, Rob filed a notice of appeal (appeal No. 1-20-0551) from the September 5, 2019, order and the denial of his motion to reconsider.

¶ 46    In June 2020, this court allowed Rob's motion to consolidate appeal No. 1-20-0551 with appeal No 1-20-0149.

¶ 47                                                    ANALYSIS

¶ 48    On appeal, Rob challenges both the September 2019 and December 2019 orders on the ground that the State did not present evidence that he was "currently" exhibiting threatening behavior within the meaning of section 2-107.1 of the Code but improperly relied on evidence of aggressive conduct from March 2019 or earlier. Separately, with respect to the December 2019 order only, Rob asserts that the court's *sua sponte* decision to allow involuntary medication for up to 180 days (when the corresponding petition and Dr. Rich's testimony only sought authorization for a 90-day period), violated his procedural due process rights.

¶ 49    Before we can reach the merits, we must decide whether mootness precludes our review. "As a general rule, courts in Illinois do not decide moot questions ***." *In re Alfred H.H.*, 233 Ill. 2d 345, 350 (2009). There is no dispute that Rob's appeals are moot, insofar as both of the underlying orders were limited in duration and have now expired. See *id.* at 350-51 (finding

- 8 -

that case was moot where involuntary commitment order "was limited in duration to 90 days and that period has long since passed"). Nevertheless, Rob asserts that we may review them under recognized exceptions to the mootness doctrine. The State disputes that any mootness exception applies and seeks dismissal of the appeals as moot.

¶ 50        Thus, the question becomes whether there is a recognized exception to the mootness doctrine that allows this court to consider Rob's separate challenges to the underlying orders. "A reviewing court will review a technically moot question *** when the question falls within one of the three recognized exceptions to the mootness doctrine: (1) the public-interest exception, (2) the capable-of-repetition exception, and (3) the collateral-consequences exception. [Citation.]" *In re Christopher C.*, 2018 IL App (5th) 150301, ¶ 13. "Mental health cases 'usually fall within one of the established exceptions to the mootness doctrine.' " *In re Debra B.*, 2016 IL App (5th) 130573, ¶ 19 (quoting *In re Alfred H.H.*, 233 Ill. 2d at 355). However, "we must decide on a case-by-case basis whether one of the recognized exceptions applies." *Id.* (citing *Alfred H.H.*, 233 Ill. 2d at 355). "[O]nly one exception must apply for us to bypass mootness and consider the merits of an appeal." *In re Katarynza G.*, 2013 IL App (2d) 120807, ¶ 9.

¶ 51        We first conclude that the "capable of repetition yet avoiding review" exception applies with respect to Rob's claim that the evidence did not show that he currently exhibited threatening behavior. *Alfred H.H.*, 233 Ill. 2d at 358. Our supreme court has explained that this exception has two elements: "First, the challenged action must be of a duration too short to be fully litigated prior to its cessation. Second, there must be a reasonable expectation that 'the same complaining party would be subject to the same action again.' " *Id.* (quoting *In re Barbara H.*, 183 Ill. 2d 482, 491 (1998)).

¶ 52        The parties do not dispute that the first element is satisfied. The State acknowledges that since the underlying orders "expired after 90 days and 180 days, respectively, the actions were necessarily too short to be fully litigated prior to their cessation." In turn, the "only question with regard to this exception is whether there is a reasonable expectation that [Rob] will personally be subject to the same action again." *Alfred H.H.*, 233 Ill. 2d at 358-59. The "actions need not be identical" but "must have a substantial enough relation that the resolution of the issue in the present case would be likely to affect a future case involving respondent." *Id.* at 359. In other words, "there must be a substantial likelihood that the issue presented in the instant case, and any resolution thereof, would have some bearing on a similar issue presented in a subsequent case." *Id.* at 360.

¶ 53        The State argues that Rob cannot meet this requirement because resolution of Rob's claims requires review of the specific facts and circumstances of his cases. Thus, the State argues that, absent speculation, Rob cannot show a sufficient likelihood that he will be subject to the same action.

¶ 54        We disagree with the State. The record in these appeals convinces us that there is a sufficient likelihood that Rob will be subject to a near-identical action requiring proof that he "currently exhibits" threatening behavior, such that the capable of repetition yet avoiding review exception applies to his claim. The record shows that Rob has been subject to two separate petitions, at which the State has offered similar evidence to argue that Rob exhibited threatening behavior. Further, Dr. Rich's testimony indicated that, without involuntary medication, Rob's symptoms will worsen and he is unlikely to accept any treatment or even to acknowledge his mental illness. This suggests a significant likelihood that another petition will

be filed. This court has previously found that such circumstances support application of the capable of repetition yet avoiding review exception. See *In re Maureen D.*, 2015 IL App (1st) 141517, ¶ 24 (in appeal from a 90-day involuntary medication order, noting the record indicates that respondent "is likely to be prescribed [psychotropic] medications in the future due to the ongoing nature of her illness; and, given her history of refusing such medications and the written information about them" there was a "reasonable expectation that respondent would be subject to the same action, involving the same issue"); see also *In re Christopher C.*, 2018 IL App (5th) 150301, ¶ 14 ("We conclude that the capable-of-repetition exception applies, here, due to the short duration of involuntary treatment orders and the respondent's ongoing mental health issues and unwillingness to take medication."). As we find that the capable of repetition yet avoiding review exception applies to Rob's claim concerning evidence of currently threatening behavior, we need not discuss whether the other two exceptions apply.

¶ 55    Separately, we find that the public interest exception to the mootness doctrine applies to Rob's other claim of error, premised on the trial court's decision at the December 2019 hearing to authorize 180 days of involuntary medication, the maximum period permitted by section 2-107.1(a-5)(5) of the Code, notwithstanding that the petition only sought authorization for up to 90 days. The public interest exception "allows a court to consider an otherwise moot case when (1) the question presented is of a public nature; (2) there is a need for an authoritative determination for the future guidance of public officers; and (3) there is a likelihood of future recurrence of the question." *Alfred H.H.*, 233 Ill. 2d at 355-56. Rob's claim concerns the length of time that a court may authorize involuntary medication under the Code. Thus, his claim satisfies the first factor, as our supreme court has held that "the procedures courts must follow to authorize the involuntary medication of mental health patients involve matters of 'substantial public concern.' " *In re Robert S.*, 213 Ill. 2d 30, 46 (2004) (quoting *In re Mary Ann P.*, 202 Ill. 2d 393, 402 (2002)); see also *In re Rita P.*, 2014 IL 115798, ¶ 36 ("resolution of this issue will affect the procedures that must be followed in proceedings under the Mental Health Code, which this court has already acknowledged are 'matters of a public nature and of substantial public concern' " (quoting *In re Mary Ann P.*, 202 Ill. 2d at 402)); *In re Nicholas L.*, 407 Ill. App. 3d 1061, 1071 (2011) ("questions about compliance with the Code's procedures involve matters of substantial public concern" (internal quotation marks omitted)).

¶ 56    Regarding the second factor, "the need for an authoritative determination of the question, we consider the state of the law as it relates to the moot question." *In re Rita P.*, 2014 IL 115798, ¶ 37. There appears to be no reported case regarding the propriety of a trial court increasing the duration of an order authorizing involuntary medication order beyond the time requested in a petition or by the testifying expert. We agree there is a need for an authoritative determination on this question. See *id.* (where no appellate decision "addressed the specific issue raised in this case," the issue was "one of first impression which, as a matter of substantial public concern, is in need of an authoritative determination"); *In re Torry G.*, 2014 IL App (1st) 130709, ¶ 28 (finding a "need for an authoritative interpretation of the matter, since no Illinois case has directly addressed" the question at issue). We believe it is important for trial judges to know whether they are authorized to impose a period of involuntary medication longer than that requested in the petition. Regarding the third factor, we also find there is a likelihood of future recurrence of the question, especially given Rob's long history of mental illness, including multiple petitions for involuntary medication. See *In re Robert S.*, 213 Ill. 2d

- 10 -

at 46 (finding public interest exception applied where "because of the short duration of orders authorizing involuntary treatment and respondent's history of mental illness, it is likely that the circumstances present in the case at bar will recur without the opportunity for resolutionary litigation before the case is rendered moot by expiration of the order"). As we find that the public interest exception applies to this claim of error, we need not discuss whether the other two mootness exceptions apply.

¶ 57    Having concluded that at least one mootness exception applies to both of Rob's claims of error, we proceed to the merits. We first address Rob's argument that both the September 2019 and December 2019 orders should be reversed on the ground that the State failed to present evidence that Rob was "currently" exhibiting threatening behavior, within the meaning of section 2-107.1 of the Code.

¶ 58    In order for a respondent to be subject to involuntary administration of psychotropic medication, section 2-107.1(a-5)(4) of the Code requires the State to prove a number of enumerated factors "by clear and convincing evidence," including that the respondent "has a serious mental illness or developmental disability," that the "benefits of the treatment outweigh the harm," that the respondent "lacks the capacity to make a reasoned decision about the treatment, and that less restrictive services have been explored and found inappropriate. 405 ILCS 5/2-107.1(a-5)(4) (West 2018). Relevant to Rob's instant argument, the State must also prove: "That because of said mental illness *** the recipient *currently exhibits* any one of the following: (i) deterioration of his or her ability to function *** (ii) suffering, or (iii) *threatening behavior*." (Emphases added.) 405 ILCS 5/2-107.1(a-5)(4)(B) (West 2018).

¶ 59    The statute instructs that, "[i]n determining whether a person meets the criteria" for these factors, "the court may consider evidence of the person's history of serious violence, repeated past pattern of specific behavior, actions related to the person's illness, or past outcomes of various treatment options." 405 ILCS 5/2-107.1(a-5)(4) (West 2018).

¶ 60    Generally, when examining an order authorizing the involuntary administration of psychotropic medication, "we will not reverse the order unless it was against the manifest weight of the evidence such that the opposite conclusion was apparent or the findings were unreasonable, arbitrary, or not based on the evidence. [Citation.]" *In re Maureen D.*, 2015 IL App (1st) 141517, ¶ 26. That is, we "review the court's factual findings to determine whether they were against the manifest weight of the evidence. [Citation.]" *In re Debra B.*, 2016 IL App (5th) 130573, ¶ 24. However, to the extent we must decide whether the court properly interpreted the Code, we review such questions *de novo*. See *In re Rita P.* 2014 IL 115798, ¶ 43; *In re Robert S.*, 213 Ill. 2d at 45.

¶ 61    There is no dispute that, with respect to both the September 2019 and December 2019 orders, the underlying petitions alleged, and the State was required to prove, that Rob exhibited threatening behavior. Rob contends that the State failed to present any evidence that he was "currently" exhibiting threatening behavior, at either the September 2019 or December 2019 hearing, to satisfy the proof required by section 2-107.1(a-5)(4)(B). 405 ILCS 5/2-107.1(a-5)(4)(B) (West 2018). He emphasizes that the State relied on evidence of acts against family members that occurred in March 2019 or earlier, at least several months before either hearing. He suggests that the trial court improperly relied on evidence of these past incidents to find that he "currently" exhibited threatening behavior. He also suggests that the court's findings are incompatible with Dr. Rich's testimony, at both hearings, that Rob had not been violent or aggressive since he was hospitalized at Madden.

- 11 -

¶ 62        In making this argument, Rob emphasizes that the term "currently" means "at present time." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/currently (last visited Oct. 12, 2021) [https://perma.cc/2GDV-BB3C]. He urges that use of the word in the "currently exhibits" phrase of section 2-107.1 serves to prevent persons from being forcibly medicated based on "stale evidence" of past incidents. He posits that the State emphasized past incidents to distract from Dr. Rich's "concession that there was no evidence of any present threatening behavior." He acknowledges the testimony at both hearings that Rob continued to have delusions about his family but argues that mere symptoms of mental illness are not enough to prove "threatening behavior" for purposes of the statute. He thus seeks reversal of both the September 2019 and December 2019 orders because there was nothing in the record to show, at the time of either hearing, that Rob was "currently" exhibiting threatening behavior due to mental illness.

¶ 63        The State responds that it met its burden to show that Rob "currently exhibits" "threatening behavior," when viewing the past incidents of aggressive behavior in combination with testimony that Rob continued to suffer from delusional beliefs after his hospitalization. The State argues that his persecutory delusions were "inextricably intertwined with the actions related to his illness," including his history of violence against the persons against whom he harbored the delusions.

¶ 64        The State suggests that Rob's argument incorrectly assumes that "currently" threatening behavior "can only be established by the occurrence of a recent overt act of violence." The State points out that the statute "does not specify that a recent overt/physical act of violence is a prerequisite" to an order authorizing involuntary medication.

¶ 65        In his reply brief, Rob acknowledges that "threatening behavior does not require an overt act of violence." However, he emphasizes Dr. Rich's testimony that Rob was polite and courteous during his hospitalization, and he suggests that the only evidence of "threatening behavior" was "six months old at his September hearing and ten months old at his December hearing," which was not "currently" threatening behavior. He argues that "mere symptoms" of his illness "cannot be a substitute for threatening behavior."

¶ 66        In parsing the language of the statute, we find that it permits a finding of current threatening behavior, even without recent overt acts of violence or aggression. We further conclude that the court could reasonably find, based on the evidence presented, that Rob currently exhibited threatening behavior.

¶ 67        In this regard, we note that, although Rob focuses on the meaning of the term "currently," it is also important to evaluate the meaning of the phrase "threatening behavior." As both parties acknowledge, "threatening behavior" does not necessarily entail violence. According to Merriam-Webster, "threatening" means "expressing or suggesting a threat of harm, danger, etc." or "indicating or suggesting the approach of possible trouble or danger." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/threatening (last visited Oct. 12, 2021) [https://perma.cc/2WKY-Y9DD]. The primary definition of threat, when used as a noun, is "an expression of intention to inflict evil, injury, or damage." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/threat (last visited Oct. 12, 2021) [https://perma.cc/G6SH-45BT]. "Behavior" is primarily defined to mean "the way in which someone conducts oneself or behaves." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/behavior (last visited Oct. 12, 2021) [https://perma.cc/4JLS-GEVA]. Thus, the statutory phrase "threatening behavior" does not require

harmful acts but can include mere expressions of harmful intent. Although Rob correctly notes that "currently" means "at the present time," the statutory requirement that the State show that a person "currently exhibits" "threatening behavior" does not mandate a showing that the person is presently engaging in physical acts of aggression or violence. Rather, construing the terms together, the statute requires the State to show that, at the present time, the person is conducting himself in a way that expresses or suggests a threat of harm or danger.

¶ 68    Furthermore, contrary to Rob's suggestion that the court could not rely on violent incidents before his hospitalization, nothing in the statute precludes consideration of past incidents in deciding whether a person currently exhibits "threatening behavior" under section 2-107.1(a-5)(4)(B). To the contrary, the statute explicitly states that, "[i]n determining whether a person meets the criteria" to satisfy the required factors under section 2-107.1(a-5)(4), "the court may consider evidence of the person's history of serious violence, repeated past pattern of specific behavior, actions related to the person's illness, or past outcomes of various treatment options." 405 ILCS 5/2-107.1(a-5)(4) (West 2018). While we agree with Rob's contention in his reply brief that a person's history is not "a substitute for current threatening behavior," the statute permits the court to consider past incidents to assist in determining whether current behavior is, in fact, threatening.

¶ 69    Having reviewed the meaning of the relevant statutory language, we proceed to conclude that the trial court's factual findings that Rob "currently" exhibited threatening behavior were not against the manifest weight of the evidence presented at either the September 2019 or December 2019 hearings. At both hearings, the court heard testimony that Rob continued to suffer from the same thoughts and delusions that had led to multiple violent incidents in the past. The court could rely on this evidence to find that he currently exhibited threatening behavior.

¶ 70    At the September 2019 hearing, the court credited Paul's testimony, which described an attack by Rob involving a pipe, an incident where Rob headbutted Paul's father, and the event in which Rob stabbed Paul with a knife and threatened others with an axe. The court could consider that history in conjunction with Dr. Rich's uncontradicted testimony that Rob was "currently symptomatic" and that Rob "exhibits threatening behavior." Dr. Rich testified that Rob has "delusions about his family" including that his brother was an arsonist. Dr. Rich also reported that Rob "asserted that he had killed his brother multiple times." We acknowledge that Dr. Rich also testified at the September 2019 hearing that Rob had been "well behaved" and was not aggressive towards anyone in the hospital. However, Dr. Rich testified that Rob continued to have delusional thoughts about his brother, including that Paul was trying to harm him. The court was entitled to consider evidence of Rob's history of violence, in conjunction with his ongoing delusions, to determine that Rob currently exhibited threatening behavior, at least against Paul. We cannot say that conclusion was contrary to the manifest weight of the evidence, notwithstanding the lack of recent acts of violence.

¶ 71    We reach a similar conclusion with respect to the trial court's conclusion, following the December 2019 hearing, that Rob currently exhibited threatening behavior. At that hearing, the court took judicial notice of Paul's September 2019 testimony regarding the past violent incidents. Further, at the December 2019 hearing, Dr. Rich testified that Rob experienced continuing symptoms, including delusions that were hostile to Paul. Dr. Rich testified that, as recently as the prior week, Rob expressed that "his brother was controlling people through video games and has multiple personalities." Dr. Rich further testified that Rob "continues to

have delusions about his brother and about the family property," including that his brother was "squatting" on the property, and that such beliefs were "precisely the sorts of ideas that led to his becoming violent towards his brother in the past." Dr. Rich acknowledged that Rob did not act aggressively toward anyone in the hospital but explained that Rob's past violence was directed toward family members "and the ideas that were the basis of that behavior are still present." The court was entitled to credit Dr. Rich's opinion that, as of December 2019, Rob continued to express the same delusions that contributed to the past violent behavior and to conclude that they amounted to current threatening behavior.

¶ 72     Keeping in mind the deferential standard of review, we cannot say that the trial court's findings that Rob currently exhibited threatening behavior were against the manifest weight of the evidence, at either the September 2019 hearing or the December 2019 hearing. That is, we do not find that the opposite conclusion was apparent or the findings were unreasonable, arbitrary, or not based on the evidence. *In re Maureen D.*, 2015 IL App (1st) 141517, ¶ 26.

¶ 73     In reaching this conclusion, we note that we are not persuaded by Rob's reliance on *In re R.K.*, 338 Ill. App. 3d 514 (2003), which reversed an involuntary medication order but was decided before section 2-107.1 included the "currently exhibits" phrase. The applicable version of the statute in *In re R.K.* required a showing that due to mental illness, respondent "exhibits any one of the following: (i) deterioration of his ability to function, (ii) suffering, (iii) threatening behavior, or (iv) disruptive behavior"; that the illness "has existed for a period marked by the continuing presence of the symptoms *** or the repeated episodic occurrence of these symptoms" and that the respondent "lacks the capacity to make a reasoned decision about the treatment." 405 ILCS 5/2-107.1(a-5)(4) (West 1998). At the bench trial on a petition seeking involuntary administration of psychotropic medication, a psychiatrist at R.K.'s hospital testified that she "experienced bouts of hostile, agitated and aggressive behavior." *In re R.K.*, 338 Ill. App. 3d at 516. A mental health technician described how, as he tried to prevent R.K. from leaving the courthouse, she became agitated and punched him and, on the same day, she threw a bag of her belongings on the ground and kicked its contents across the floor. *Id.* On appeal, this court found that the trial court did not err in determining that R.K. "exhibited deterioration of her ability to function and threatening behavior." *Id.* at 521. However, we proceeded to find "that the State presented little or no evidence of the continuing presence of these symptoms after her hospitalization, and presented only one instance of a 'repeated episodic occurrence' of threatening behavior which was triggered by outward circumstances." *Id.* We also found that the State failed to prove that R.K. lacked the capacity to make a reasoned decision about her treatment or that the benefits of the suggested medications outweighed their potential harm. *Id.* at 521-22.

¶ 74     Rob suggests that, because we reversed R.K.'s involuntary medication order where there was evidence of only one episode of violent behavior during her hospitalization, we must reverse the orders in his case because there was no testimony that Rob ever acted violently during his hospitalization. However, *In re R.K.* is inapposite to Rob's challenge to the evidence supporting the September 2019 and December 2019 orders since we explicitly found that the trial court did *not* err in determining that R.K exhibited "threatening behavior." Instead, the reversal in *In re R.K.* was based on the State's failure to prove other statutory factors that are not at issue in Rob's appeals.

¶ 75     In his petition for rehearing, Rob emphasizes that when *In re R.K.* was decided, the Code required evidence that the respondent "exhibits" deterioration of his ability to function,

suffering, or threatening behavior (405 ILCS 5/2-107.1(a)(4)(B) (West 2000)), whereas the Code now requires evidence that the respondent "currently exhibits" such factors (405 ILCS 5/2-107.1(a-5)(4)(B) (West 2018)). He urges that "[i]f the facts in *In re R.K.* were insufficient to comply with the Code, then the facts here are even slimmer under the current more stringent standard." However, our court in *In re R.K.* found that the trial court did *not* err in determining that respondent exhibited threatening behavior. *In re R.K.*, 338 Ill. App. 3d at 521. Moreover, we note that the version of the statute at issue in *In re R.K.* did not include the language that now explicitly permits the court to "consider evidence of the person's history of serious violence [and] repeated past pattern of specific behavior" in deciding whether the requisite factors have been shown. 405 ILCS 5/2-107.1(a-5)(4) (West 2018).

¶ 76   The remaining arguments in Rob's petition for rehearing are also without merit. Rob claims our decision conflicts with three cases from other districts indicating that mere symptoms of mental illness do not suffice as proof of the requisite factors under section 2-107.1(a-5)(4). Two of the cases hold that for the State to show that respondent is "suffering" due to mental illness within the meaning of section 2-107.1(a-5)(4)(B), the State must do more than show symptoms of mental illness but must show that the symptoms cause the respondent to suffer. See *In re Beverly B.*, 2017 IL App (2d) 160327, ¶ 43; *In re Debra B.*, 2016 IL App (5th) 130573, ¶ 45. Rob also cites a Third District decision finding that the State did not prove that the respondent "lack[ed] the capacity to make a reasoned decision about the treatment" within the meaning of section 2-107.1(a-5)(4)(E), rejecting the State's argument that respondent "cannot make a reasoned decision concerning her treatment because she has 'interfering pathological beliefs' about her condition and hospitalization." *In re Alaka W.*, 379 Ill. App. 3d 251, 264-65 (2008) (reasoning that the State's argument "[t]aken to its natural conclusion," would mean that an "allegation of mental illness alone would preclude a finding that the respondent can make a reasoned decision concerning treatment"). Our decision does not conflict with this precedent. First, none of the three cases concerns evidence of "threatening behavior," the precise factor at issue in this case. 405 ILCS 5/2-107.1(a-5)(4)(B) (West 2018). More importantly, we do not suggest that the mere fact of Rob's mental illness, or that he had some unspecified delusions, would alone be sufficient to prove that factor. Rather, the trial judges at both hearings considered Dr. Rich's testimony that Rob continued to express the same specific delusions about his brother that contributed to his past violent behavior. These continuing delusions, combined with evidence of past violent behavior, permitted findings that Rob currently exhibited threatening behavior.[3]

¶ 77   Rob's petition for rehearing also contends that we employed the wrong standard of review. He argues that he solely raised an issue of statutory construction, such that *de novo* review applied to the trial court's determinations that he currently exhibited threatening behavior. That is, he contends that the "manifest weight of the evidence" standard was wholly inapplicable. He is incorrect. *De novo* review applies to the meaning of the statutory provisions at issue,

---

[3]Rob's petition for rehearing elsewhere suggests that our opinion "misapprehends" the Code "by prioritizing his past behavior over his current months-long-stretch of nonthreatening, nonaggressive behavior." However, nothing in this opinion "prioritizes" evidence of past behavior over evidence of more recent behavior. Rather, in assessing whether the court's findings were against the manifest weight of the evidence, we simply recognize that the Code explicitly allowed the trial court to "consider evidence of the person's history of serious violence, repeated past pattern of specific behavior, [and] actions related to the person's illness." 405 ILCS 5/2-107.1(a-5)(4) (West 2018).

- 15 -

including "threatening behavior." See *In re Robert S.*, 213 Ill. 2d at 45 (*de novo* review applies to "matters of statutory construction" concerning section 2-107.1 of the Code). However, a trial court's findings that there was clear and convincing evidence of the requisite factors under section 2-107.1(a-5)(4) are reviewed for whether they are against the manifest weight of the evidence. See *In re Debra B.*, 2016 IL App (5th) 130573, ¶ 24 (applying manifest weight of the evidence review to findings that State proved by clear and convincing that respondent lacked the capacity to make a reasoned decision under section 2-107.1(a-5)(4)(E) and that she was suffering and that her ability to function had deteriorated under section 2-107.1(a-5)(4)(B)).

¶ 78    Rob's petition further claims that, even under the manifest-weight-of-the-evidence standard, our conclusion is incorrect because the record did "not show that Rob had delusions during his past threatening behavior." He suggests that "[l]ooking at [Paul's] testimony neutrally, one could as easily believe" that Rob's violent behavior toward Paul and Paul's father "resulted from them letting themselves into his apartment without his permission" rather than from delusions. He also claims that Dr. Rich's testimony about Rob's delusions was "not clear and convincing." Rob essentially asks us to reweigh the testimony, which is improper under the deferential manifest weight of the evidence standard. See *In re D.F.*, 201 Ill. 2d 476, 498-99 (2002) ("[u]nder a manifest weight of the evidence standard, we give deference to the trial court as the finder of fact" and a reviewing court "must not substitute its judgment for that of the trial court regarding the credibility of witnesses [or] the weight to be given to the evidence").

¶ 79    Finally, insofar as the petition claims that a commitment hearing would be more appropriate to address concerns that Rob would be violent in the future, and that "[f]orced medication should not be used to accomplish what the less restrictive treatment of hospitalization was achieving for Rob," those claims were not contained in Rob's opening brief and are forfeited. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."). In any event, they are irrelevant to the propriety of the trial court's rulings.

¶ 80    For the foregoing reasons, we reject Rob's challenges to the September 2019 and December 2019 orders to the extent he claims there was no evidence to support the trial court's findings that Rob "currently exhibit[ed]" threatening behavior within the meaning of section 2-107.1 of the Code.

¶ 81    We turn to Rob's other claim of error on appeal, which is an as-applied constitutional due process challenge directed to the December 2019 order. On due process grounds, Rob challenges the court's decision at the conclusion of the December 2019 hearing to authorize up to 180 days of involuntary medication notwithstanding that the petition sought only authorization for 90 days. Rob contends that, under the facts of his case, the court's application of section 2-107.1 violated his due process rights, insofar as he lacked notice that the duration of the order could be 180 days and there was "no testimony or medical opinion *** in support of a 180-day order." He points out that the State never sought authorization for more than 90 days, that Dr. Rich testified that he was seeking a 90-day order, and his counsel had no opportunity to cross-examine any witness as to the need for a longer order. He contends that an order granting relief in excess of what is specifically prayed for in a petition results in unfair surprise and that the court's decision in this case erroneously deprived him of a fundamental liberty interest.

- 16 -

¶ 82　　In response, the State initially contends that Rob's due process argument is forfeited and cannot be raised for the first time on appeal. The State cites *People v. Thompson*, 2015 IL 118151, and *People v. Minnis*, 2016 IL 119563, but those authorities are procedurally distinguishable. *Thompson* held that forfeiture applied to an as-applied constitutional challenge that was not contained in a petition for relief from a final judgment pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2010)) but was raised for the first time in an appeal from dismissal of the petition. *Thompson*, 2015 IL 118151, ¶ 40. *Minnis* held that an "as applied" challenge to a statute on first amendment grounds would be inappropriate and premature where "the circuit court held no evidentiary hearing and made no findings of fact." *Minnis*, 2016 IL 119563, ¶ 19. That is not the case here, where the court elected to impose a 180-day order following an evidentiary hearing. In any event, this court has recognized that "forfeiture is not apt [when] the issue relates to public and liberty interests relating to the administration of psychotropic drugs upon an unwilling patient." *In re Katarzyna G.*, 2013 IL App (2d) 120807, ¶ 10; see also *In re H.P.*, 2019 IL App (5th) 150302, ¶ 27 ("Because the involuntary administration of psychotropic medication implicates fundamental rights, we often review forfeited claims in mental health cases under the plain error doctrine."). We thus reject the State's suggestion that Rob's due process argument is forfeited.

¶ 83　　As a second threshold argument, the State urges that we should not review Rob's argument because our supreme court has indicated that reviewing courts should only reach constitutional issues as a last resort. See *In re E.H.*, 224 Ill. 2d 172, 178 (2006) ("We have repeatedly stated that cases should be decided on nonconstitutional grounds whenever possible, reaching constitutional issues only as a last resort."). The State suggests that Rob's claim "can be resolved on nonconstitutional grounds" and proceeds to argue that the language of section 2-107.1 of the Code rebuts Rob's claim that he was deprived of adequate notice. However, as explained below, we disagree with the State's construction of the statute. Moreover, given the significant liberty interests at stake, we choose to proceed to the merits of Rob's procedural due process challenge.

¶ 84　　Rob's claim raises constitutional arguments regarding construction and application of section 2-107.1. "The standard of review for determining whether an individual's constitutional rights have been violated is *de novo*. [Citation.] We apply the same standard in matters of statutory construction." *In re Robert S.*, 213 Ill. 2d at 45.

¶ 85　　Notably, Rob raises an "as applied" challenge to the statute; that is, he does not claim that the statute is facially invalid under any circumstances. See *In re M.A.*, 2015 IL 118049, ¶ 39 (explaining that "[a] statute is facially invalid only if there is no set of circumstances under which the statute would be valid"); *Thompson*, 2015 IL 118151, ¶ 36 ("a facial challenge requires a showing that the statute is unconstitutional under any sets of facts, *i.e.*, the specific facts related to the challenging party are irrelevant"). In contrast, an "as applied" claim, such as that asserted by Rob, "challenges how a statute was applied in the particular context in which the plaintiff acted or proposed to act. [Citation.] In an 'as applied' challenge, the facts surrounding the plaintiff's particular circumstances become relevant." *In re M.A.*, 2015 IL 118049, ¶ 40. If a party prevails in an "as applied" challenge, "enforcement of the statute is enjoined only against the plaintiff" but does not void the statute in its entirety. *Id.*

¶ 86　　Rob claims that the court's application of section 2-107.1(a-5)(5) to enter an order for up to 180 days of involuntary medication violated his procedural due process rights under the federal and Illinois constitutions. U.S. Const., amend. XIV, § 1; Ill. Const. 1970, art. I, § 2.

"Procedural due process claims challenge the constitutionality of the specific procedures used to deny a person's life, liberty, or property. [Citation.] The fundamental requirements of due process are notice of the proceeding and an opportunity to present any objections." *People v. Cardona*, 2013 IL 114076, ¶ 15.

¶ 87 The United States Supreme Court has "set forth three factors that must be considered when determining whether an individual has received the 'process' that the Constitution finds 'due':

'First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and, finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.' " *In re Robert S.*, 213 Ill. 2d at 48-49 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

"By weighing these factors, courts can determine whether the government has met the fundamental requirements of due process—the opportunity to be heard at a meaningful time and in a meaningful manner." *Id.* at 49 (citing *Mathews*, 424 U.S. at 333).

¶ 88 Rob argues that the three-factor analysis leads to a conclusion that his right to due process was violated when the court applied section 2-107.1(a-5)(5) to impose an order authorizing involuntary medication for 180 days, when the December 2019 petition requested authorization for only 90 days, and Dr. Rich's hearing testimony confirmed that he only sought authorization for 90 days. For the following reasons, we agree with Rob.

¶ 89 With respect to the first factor, there is no doubt that the duration of Rob's involuntary medication order impacted a significant "private interest." Our supreme court has held "there is no question that the private interest affected by the forced administration of psychotropic drugs is substantial." *In re Robert S.*, 213 Ill. 2d at 49. "[I]nvoluntary mental health services, including the involuntary administration of psychotropic drugs, involve a massive curtailment of liberty." (Internal quotation marks omitted.) *Id.* at 46; see also *In re C.E.*, 161 Ill. 2d 200, 213 (1994) (recognizing that, pursuant to *Washington v. Harper*, 494 U.S. 210 (1990), a mentally ill person has a "liberty interest, under the due process clause of the fourteenth amendment to the United States Constitution, in refusing the administration of psychotropic medication"). In this case, the court's decision at the conclusion of the December 2019 hearing resulted in Rob being subject to involuntarily administration of psychotropic medication for 180 days, a period twice as long as that specifically requested in the petition and by Dr. Rich in his hearing testimony. Clearly, this decision impacted a substantial private interest.

¶ 90 Regarding the second factor, we find that the trial court's *sua sponte* decision to authorize up to 90 days of involuntary medication beyond that requested by the petition resulted in an "erroneous deprivation" of Rob's liberty interest. This occurred in two ways. First, Rob was deprived of notice that he could be subject to involuntary medication for a duration of 180 days, twice that requested by the petition. Second, there was no evidence elicited at the hearing to support the court's authorization of involuntary medication beyond 90 days.

¶ 91 Under the record in this case, we believe it is clear that Rob had no reason to believe, before the trial court's *sua sponte* decision, that the December 2019 hearing could result in an order subjecting him to more than 90 days' of involuntary medication. In this regard, we reject the State's contention that Rob was on notice, by virtue of the statutory language, that the court's December 2019 order could be up to 180 days. The State points out that section 2-107.1(a-

5)(5) permits imposition of an order of up to 180 days' duration where a respondent has been subject to two or more prior orders:

> "In no event shall an order issued under this Section be effective for more than 90 days. A second 90-day period of involuntary treatment may be authorized pursuant to a hearing that complies with the standards and procedures of this subsection (a-5). *Thereafter, 180-day periods of involuntary treatment may be authorized pursuant to the standards and procedures of this Section without limit.*" (Emphasis added.) 405 ILCS 5/2-107.1(a-5)(5) (West 2018).

The State also points out that there is no provision in section 2-107.1 explicitly requiring a petition to set forth the proposed length of the order sought. The State thus suggest that a respondent has no "justifiable expectation" that the duration of an involuntary medication order will be limited to that stated in the petition or hearing testimony. The State further urges that, since the December 2019 petition stated that it was brought pursuant to section 2-107.1 and referenced Rob's March 2019 hospitalization at UIC as well as the September 2019 order, Rob was on notice that the petition sought a third involuntary treatment order, which could be up to 180 days.

¶ 92 Under the record in this case, we reject the State's arguments that the statutory language provided adequate notice to Rob that the court could impose involuntary treatment of up to 180 days. The State invites us to conclude that the due process inquiry ends with the statutory language authorizing up to 180 days, despite anything else in the record indicating that Rob was led to believe that he would be subject to no more than a 90-day order. However, we reiterate that Rob raises an as applied challenge to the court's application of section 2-107.1. Thus, the particular circumstances of Rob's case must be taken into account. See *In re A.C.*, 2016 IL App (1st) 153047, ¶ 31 ("an as-applied challenge requires a party to demonstrate that the statute is unconstitutional as applied in that party's particular circumstances, rending the party's factual context relevant"). In this case, the trial court's decision to authorize up to 180 days of involuntary medication must be viewed in context of the particular circumstances of the proceeding, including (1) that the December 2019 petition explicitly sought authorization "for up to ninety (90) days" and (2) the State elicited testimony from Dr. Rich that he requested authorization for 90 days of treatment. There is no dispute that the trial court's ruling was the first time during the proceeding that a 180-day order was suggested. These facts belie the State's claim that Rob was on notice that the court might impose the longest duration permitted by section 2-107.1(a-5)(5).

¶ 93 Even if section 2-107.1 does not explicitly *require* a petition to seek a specific duration, we cannot ignore the practical effect of the fact that Dr. Rich, in the December 2019 petition, elected to specify that he sought an order of up to 90 days. Given that specific pleading, Rob could not have reasonably expected the court to impose anything more than what was requested. The State cites no authority suggesting that, where a petition under section 2-107.1 explicitly requests a duration less than the statutory maximum duration, the court may unilaterally decide to impose a longer order. Allowing such action would be inconsistent with our precedent recognizing that pleadings serve to limit the relief that may be granted. See, *e.g.*, *Lo v. Provena Covenant Medical Center*, 356 Ill. App. 3d 538, 542 (2005) ("[t]he complaint frames the issues for the court and circumscribes the relief it can award"); *Goodwine State Bank v. Mullins*, 253 Ill. App. 3d 980, 988 (1993) ("relief may be granted under a general prayer for relief only when it is consistent with the facts alleged and proved, provided it does

not take the defendant by surprise" (citing *Galapeaux v. Orviller*, 4 Ill. 2d 442, 450 (1954))); *Rauscher v. Albert*, 145 Ill. App. 3d 40, 44 (1986) ("a grant of relief in excess of that specifically prayed for requires that the court protect the adverse party from surprise").

¶ 94    Furthermore, nothing in the State's evidence hinted that anything other than a 90-day order would be sought. The State explicitly asked Dr. Rich to confirm that he sought authorization for a 90-day order, and Dr. Rich agreed. Given the record, Rob was led to believe that the petition, if granted, would result in a 90-day order. Had Rob known that he could be subject to involuntary medication for twice that length of time, he and his counsel may have elected a different strategy at the evidentiary hearing. For example, his counsel could have cross-examined Dr. Rich as to his opinion regarding how long Rob should be medicated. Rob may also have elected to present his own evidence, perhaps including his own testimony. However, Rob and his counsel had no reason to know that a 180-day order was a potential outcome and, in turn, had no meaningful opportunity to argue that issue before the court's ruling. In turn, we find that Rob was deprived of an adequate "opportunity to be heard at a meaningful time and in a meaningful manner." *In re Robert S.*, 213 Ill. 2d at 48-49.

¶ 95    Apart from the lack of notice, we also find the trial court's decision to authorize involuntary medication for 180 days was improper, insofar as there was no evidence supporting an order of more than 90 days' duration. In this regard, we reject the State's argument that section 2-107.1 does not require it to "prove the specific duration for which the order is necessary or sought." We find the State must provide some evidence to support the duration, given section 2-107.1(a-5)(4)'s requirement that the State prove by clear and convincing evidence that, *inter alia*, "the benefits of the treatment outweigh the harm." 405 ILCS 5/2-107.1(a-5)(4)(D) (West 2018). That threshold requirement precedes subsection (a-5)(5), which states that an initial order will be effect for no more than 90 days, that a second 90-day order "may be authorized pursuant to a hearing that complies with the standards and procedures of this subsection (a-5)," and, relevant to Rob's December 2019 order, that "additional 180-day periods *** may be authorized *pursuant to the standards and procedures of this Section* without limit." (Emphasis added.) 405 ILCS 5/2-107.1(a-5)(5) (West 2018). That is, the court's power to authorize involuntary medication for up to 180 days is contingent upon the State meeting its threshold burden to show, among other factors, that "the benefits of the treatment outweigh the harm." Simply put, we do not see how the State can show the benefits of the treatment without providing some evidence of the treatment's proposed duration.

¶ 96    In this regard, this court has applied similar reasoning to find that the "type of medication to be used is a necessary component" of section 2-107.1(a-5)(4)'s requirement that the State prove that the benefits of treatment outweigh the harm, such that "[c]ourts have 'generally required some evidence of the medications to be used.'" (Internal quotation marks omitted.) *In re Louis S.*, 361 Ill. App. 3d 774, 781 (2005) (quoting *In re Len P.*, 302 Ill. App. 3d 281, 285-86 (1999)). Similarly, this court has interpreted section 2-107.1(a-5)(4) to require the State to present "evidence as to the anticipated range of dosages of the proposed psychotropic medication" (*In re A.W.*, 381 Ill. App. 3d 950, 959 (2008)) and "to require the State to present expert testimony describing both the expected benefits and the possible side effects of each medication requested in the petition." *In re H.P.*, 2019 IL App (5th) 150302, ¶ 33. Consistent with this precedent, we find that some evidence must be shown to support the length of time that the State seeks to administer psychotropic medication, in order to meet its statutory burden to prove that the benefits of the treatment outweigh the harm.

¶ 97    Having found that the trial court's action led to erroneous deprivation of Rob's liberty interest, we consider the third and final factor under the procedural due process framework—the State's interest, " 'including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.' " *In re Robert S.*, 213 Ill. 2d at 48-49 (quoting *Mathews*, 424 U.S. at 335). We find that this factor also weighs in favor of Rob's procedural due process challenge to the December 2019 order.

¶ 98    Regarding this factor, Rob contends that he does not seek any "additional imposition" but that "adherence to basic civil procedure will mitigate" against a trial court imposing a longer-than-requested involuntary medication order, without prior notice to the respondent. The State does not attempt to argue that any administrative burden will result from recognition that a trial court should not *sua sponte* authorize involuntary medication for a longer duration than that requested in a petition. We do not see any reason why the State or the trial court will be burdened by such a rule. Similarly, we see no reason why it will be unduly burdensome for the State to elicit some evidence to support the duration of involuntary medication. As discussed, the State is already required to elicit evidence regarding proposed medications in the course of proving that the benefits of the treatment outweigh the harm. There is no reason to doubt that the same witnesses who provide that evidence will be able to testify regarding the duration of the administration of the medication. In any event, given the significant liberty interest at stake, any burden to the courts or State from this requirement is negligible in comparison.

¶ 99    We thus agree with Rob that his procedural due process rights were violated under the specific facts of his case, insofar as the trial court authorized involuntary medication for up to 180 days where (1) the December 2019 petition requested authorization for up to 90 days and (2) there was no evidence to support more than 90 days of medication. On that basis, we reverse the December 2019 involuntary medication order.

¶ 100                              CONCLUSION

¶ 101    For the foregoing reasons, we affirm the September 2019 order entered by Judge Hannon in case No. 19-COMH-2915 authorizing up to 90 days of involuntary medication, but we reverse the December 2019 order entered by Judge Patton in case No. 19-COMH-4517 authorizing up to 180 days of involuntary medication.

¶ 102    Affirmed in part and reversed in part.